**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONNA VEEDER, STACY VEEDER and**
**BRENDAN VEEDER,**

                                        **Plaintiffs,**

         **vs.**                                                    **1:10-cv-665**
                                                                    **(MAD/CFH)**

**STEVEN NUTTING, Individually and in his**
**Official Capacity as an Investigator for the**
**New York State Police; DAVID BURNS, Individually**
**and in their Official Capacity as Investigators for the**
**New York State Police; ROBERT J. MARTIN, Individually**
**and in their Official Capacity as Investigators for the New**
**York State Police; KELLY STRACK, Individually and in**
**their Official Capacity as Investigators for the New York**
**State Police; DREW McDONALD, Individually and in their**
**Official Capacity as Investigators for the New York State**
**Police; GEORGE PORT, Individually and in their Capacity**
**as Lieutenants for the New York State Police; STEPHEN**
**HOGAN, Individually and in their Capacity as an Attorney**
**for the New York State Police,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**OFFICE OF KEITH F. SCHOCKMEL**             **KEITH F. SCHOCKMEL, ESQ.**
4 Atrium Drive
Suite 290, Executive Woods
Albany, New York 12205
Attorneys for Plaintiffs

**OFFICE OF THE NEW YORK**                    **KELLY L. MUNKWITZ, AAG**
**STATE ATTORNEY GENERAL**                    **MICHAEL G. McCARTIN, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION[1]**

On June 8, 2010, Plaintiffs commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants acted in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. *See* Dkt. No. 1. On May 6, 2011 and May 17, 2011, respectively, Plaintiffs filed a first and second amended complaint. *See* Dkt. Nos. 25 and 27.

In a March 2, 2012 Memorandum-Decision and Order, the Court granted in part and denied in part Defendants' partial motion for judgment on the pleadings. *See* Dkt. No. 50. Specifically, the Court dismissed Plaintiffs' claims against the New York State Defendants in their official capacities and dismissed Defendants Burns, Strack, McDonald, Gilliam, Valoze, Hard and John Doe1 for lack of personal involvement. *See id.* at 16. Thereafter, in an April 24, 2012 Memorandum-Decision and Order, the Court denied Plaintiffs' motion for reconsideration, but allowed Plaintiffs to amend their complaint. *See* Dkt. No. 54. Specifically, the Court found that the proposed amended complaint sufficiently alleges the personal involvement of Defendants Burns, McDonald and Strack, thereby curing the deficiencies discussed in the Court's March 2, 2012 Memorandum-Decision and Order. *See id.* at 12.

Currently before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for partial summary judgment on the issue of liability.

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

## II. BACKGROUND[2]

### A. Relevant background

On or about May 23, 2008, Plaintiff Donna Veeder awoke between 7:00 and 7:30 a.m., and discovered that her husband, Garry Veeder, was not in bed. *See* Dkt. No. 62-1 at ¶ 5. Plaintiff Donna Veeder looked for her husband and found a Post-It note on the back door that read "I am in the garage." *See id.* at ¶ 6. Plaintiff Donna Veeder exited the house and crossed the deck to the garage, where she found her husband hanging with a plastic bag over his head. *See id.* at ¶ 7.

At this point, Plaintiff Donna Veeder screamed for her daughter, Plaintiff Stacy Veeder, who was asleep upstairs in the home. *See id.* at ¶ 8. Plaintiff Stacy Veeder ran to the garage and saw her father hanging by a rope. *See id.* at ¶ 9. At this point, Plaintiff Donna Veeder told her daughter to call 911, which she did. *See id.* at ¶ 10. The EMTs and the Albany County Sheriff's Department were the first to respond to the 911 call at approximately 8:00 a.m. *See id.* at ¶ 11.

Defendant Steven Nutting was on his way to work on the morning of May 23, 2008, when he received a call from New York State Police Troop G Headquarters in Loudonville, New York. *See id.* at ¶ 13. He was directed to report to the scene of an unattended death of a New York State Police lab employee, *i.e.*, Garry Veeder. *See id.* at ¶ 13. As he was responding to the scene, Defendant Nutting called Defendants Burns and Martin and directed both investigators to report to the scene. *See id.* at ¶ 14.

Defendant Burns was the first non-uniformed member of the State Police at the scene. *See id.* at ¶ 15. Defendant Burns arrived at approximately 8:50 a.m., almost an hour after members of

_____

[2] Unless otherwise noted, the facts contained in the "Background" section of this Memorandum-Decision and Order are not in dispute.

the Albany County Sheriff's Department arrived. *See id.* When he arrived, he saw Timothy Hard and various members of the Albany County Sheriff's Department in the driveway. *See id.*

Members of the Albany County Sheriff's Department briefed Defendant Burns on what they knew, including the fact that it appeared that Garry Veeder hanged himself in his garage. *See id.* at ¶ 16. Further, Defendant Burns was advised that Garry Veeder was a civilian employee of the New York State Police and that the Sheriff's Department was willing to turn its investigation over to the State Police. *See id.* Defendant Burns was also informed that Garry Veeder appeared to have left letters for the members of his family. *See id.* at ¶ 17; *but see* Dkt. No. 67-1 at ¶ 17 (denying any inference indicating that anyone knew at that point the content of the letters because they were still sealed in their envelopes).

Defendant Nutting arrived at the scene approximately five-to-ten minutes after Defendant Burns. *See id.* at ¶ 18. Defendant Burns and Craig Apple, Undersheriff for the Albany County Sheriff's Department, briefed Defendant Nutting about the situation. *See id.* at ¶ 19. They informed Defendant Nutting about the existence of the letters and Undersheriff Apple confirmed that Garry Veeder was a civilian employee with the State Police. *See id.*

According to Defendants, because Garry Veeder was a civilian employee with the State Police, Undersheriff Apple offered to turn the investigation over to Defendant Nutting, which Defendant Nutting accepted. *See id.* at ¶ 20. Further, Defendants claim that, "[g]enerally, when an investigation concerns an employee of a law enforcement agency, that agency assumes control over the investigation." *See id.* Defendant Nutting subsequently appointed Defendant Burns as lead investigator. *See id.* at ¶ 21.[3]

---

[3] At this point, the parties recollections of the events that transpired begin to differ substantially.

After being advised that Garry Veeder's wife was in the house, Defendant Burns entered the house through the back door to speak to her. *See id.* at ¶ 22. Defendant Burns found Plaintiff Donna Veeder in her kitchen speaking with Albany County Sheriff Investigator Higgins. *See id.* at ¶ 23. Investigator Higgins introduced Defendant Burns to Plaintiff Donna Veeder. *See id.* Defendant Burns advised Plaintiff Donna Veeder that the State Police were taking over the investigation. *See id.* at ¶ 24. Initially, Plaintiff Donna Veeder was upset to hear that the State Police were taking over the investigation because of her belief that the State Police drove her husband to suicide. *See id.* Defendant Burns explained that he did not know Garry Veeder and that he merely wanted to rule out criminality in connection with Mr. Veeder's death. *See id.*

At this point, Plaintiff Donna Veeder had paperwork sitting in front of her on the kitchen table, which she proceeded to take into another room. *See id.* at ¶ 25; Dkt. No. 67-1 at ¶ 25. Defendant Burns was advised that Garry Veeder had left letters to his family and, although the envelopes were still sealed, they believed that they may be relevant to their investigation. *See id.*; Dkt. No. 67-1 at ¶ 25.

When Plaintiff Donna Veeder returned to the kitchen table to continue talking to the investigators, Defendant Burns informed her that he would need to secure as evidence the folder with the letters inside in the investigation into her husband's death. *See id.* at ¶ 26. Plaintiff Donna Veeder advised Defendant Burns that she would like to contact her attorney and proceeded to do so. *See id.* at ¶ 27. Defendant Burns then spoke with Plaintiff Donna Veeder's attorney,[4] who advised Defendant Burns that the letters to Plaintiff Donna Veeder and himself were not to be seized by the State Police. *See id.* at ¶ 28. Defendant Burns informed Plaintiffs' attorney that

---

[4] Although Defendants identify the attorney as Steven Kouray, Plaintiffs state that it was an attorney from Steven Kouray's office, and believe that it was Brian Mercy. *See* Dkt. No. 62-1 at ¶ 28; Dkt. No. 67-1 at ¶ 28.

he was "going to secure the stuff" and that the attorney could address the issue with his bosses. *See* Dkt. No. 67-1 at ¶ 28 (citation omitted).

At this point, Defendant Burns went outside to advise his supervisor, Defendant Nutting, about the issues regarding the letters. *See* Dkt. No. 62-1 at ¶ 30. Defendant Nutting then entered the house to speak to Plaintiff Donna Veeder and informed her that they needed to secure the letters as part of their investigation. *See id.* at ¶ 31; Dkt. No. 67-1 at ¶ 31. Plaintiff Donna Veeder again objected and argued that securing the letters was unnecessary because her husband's death was obviously a suicide. *See id.* at ¶ 32. Defendant Nutting explained to her that all death investigations are considered homicides until all the evidence is collected and reviewed, and that such evidence will include letters, physical evidence from the immediate scene and autopsy results. *See id.* at ¶ 33.[5] At no point did Defendants attempt to obtain a search warrant.

Eventually, Plaintiff Donna Veeder relinquished the folder containing the letters and then called her attorney. *See id.* at ¶ 34. Defendant Nutting stepped outside to give Plaintiff Donna Veeder privacy for her telephone call. *See id.* at ¶ 35. Upon speaking with her attorney, Steven Kouray, Mr. Kouray spoke with Defendant Nutting and informed him that "under no circumstances was that stuff [the letters] to leave the house[.]" *See* Dkt. No. 67-1 at ¶ 35. Mr. Kouray asserted spousal and attorney/client privilege as his grounds for denying Defendant Nutting access to the letters. *See id.*

---

[5] Plaintiffs admit that Defendant "Nutting told Donna Veeder that he could take anything he wanted" but "[d]eny that there was any suspicion on any defendant's part that evidence of a crime was present at the Veeder residence." *See* Dkt. No. 67-1 at ¶ 33. Throughout their response, Plaintiffs repeatedly contend that Defendants inappropriately characterize their presence at Plaintiffs' home as an "investigation" and complain that Defendants are implying that there was evidence of criminal activity or that they ever suspected such. Therefore, many of the denials in Plaintiffs' response to Defendants' statement of material facts do not deny the substance of Defendants' assertion, but simply object to any implication that they suspected criminal activity in relation to Garry Veeder's suicide.

According to Defendant Nutting, the objection to his seizure of the letters presented him with a novel issue and, therefore, he contacted both Division Counsel's Office and the Albany County District Attorney's Office. *See* Dkt. No. 62-1 at ¶ 36. Defendant Stephen P. Hogan, First Deputy Counsel for the New York State Police, does not recall any conversation with Defendant Nutting concerning Garry Veeder. *See id.* at ¶ 38. Defendant Hogan stated in his declaration, however, that it would not be his practice to advise Defendant Nutting, or any member of the State Police, to search or seize evidence without a warrant, consent, or another exception to the warrant requirement. *See id.* at ¶ 39 (citation omitted). Plaintiffs, however, contend that Defendant Port testified that, pursuant to Defendant Hogan's direction, he searched (opened) Plaintiffs' property. *See* Dkt. No. 67-1 at ¶ 39. Further, Plaintiffs claim that Defendant Nutting averred in his answer to the initial complaint that he "'followed legal advice [in seizing the letters], and placed the envelopes in a sealed evidence bag,'" and that Defendant Nutting subsequently identified Defendant Hogan as the individual who provided him with this "legal advice." *See id.* (quotation omitted). After the letters were sealed in an evidence bag, Defendant Nutting provided the letters to Defendant Kelly Strack, a member of the Forensic Identification Team ("FIU"), and did not see the folder or letters after relinquishing them to her. *See* Dkt. No. 62-1 at ¶ 41.

**B.      The search of the residence**

Defendants Drew McDonald and Kelly Strack, members of the FIU, were also assigned to investigate the unattended death of Garry Veeder. *See id.* at ¶¶ 42-43. The FIU is a support unit that assists the State Police, Sheriff's Departments, and local police agencies with documentation, collection, preservation and processing of physical evidence and crime scenes. *See id.* at ¶ 44.

When Defendants Strack and McDonald arrived at the Veeders' residence, they were

briefed in the driveway by State Police members already at the scene. *See id.* at ¶ 45. They were advised that Plaintiff Donna Veeder found a Post-It note on the inside of the back door advising that her husband was in the garage, and that when she entered the garage, she found her husband hanging from a rope with a plastic bag over his head. *See id.*

Prior to processing the scene, Defendant Strack and/or Defendant McDonald asked Defendant Burns whether they had consent to search or whether they needed a warrant. *See id.* at ¶ 46. At this point, Defendant Burns returned to the house to ask Plaintiff Donna Veeder if she would consent to the search. *See id.* at ¶ 47. Defendant Burns provided Plaintiff Donna Veeder with the consent form, which she signed. *See id.* Defendants McDonald and Strack were provided with Plaintiff Donna Veeder's written consent and began processing the scene at approximately 9:44 a.m. *See id.* at ¶¶ 49, 52. Defendants Strack and McDonald commenced by photographing the property and then proceeded to work their way into the garage and house. *See id.* at ¶ 51. During the search, Defendant McDonald discovered and seized an attache case, which, according to Defendants, "contained documents that appeared to establish that Garry Veeder was having problems at work. Because problems at work would tend to support a conclusion of suicide, Investigator McDonald secured the attache case as evidence." *See id.* at ¶ 53.

Plaintiff Donna Veeder's rendition of the search of her residence differs considerably from Defendants'. According to Plaintiff Donna Veeder, after her daughter returned to the residence after giving her statement, Defendants Nutting and Burns informed her that she and her family needed to leave the residence because "they intended to search [her] home and [she] could not be present." *See* Dkt. No. 67-3 (Aff. of Donna Veeder dated Aug. 14, 2012) at ¶ 20. Plaintiff Donna Veeder claims that she then informed Defendants Nutting and Burns that she believed that they needed a warrant, "to which Nutting responded, shouting, to the effect that he could do anything

he wanted as my house was a 'crime scene.'" *See id.* at ¶ 21. Moreover, she claims that Defendant Nutting added that if the Veeders refused to leave, he would "tape off" their home and prevent their reentry. *See id.* at ¶ 22. Furthermore, she claims that Defendant Burns "screamed at [her] that he would go through every room and every item in [their] home and [the Veeders] would be unable to get back into it for days." *See id.* at ¶ 23. Plaintiff Donna Veeder claims that, at this point, she was feeling extremely ill and "no longer able to battle with defendants." *See id.* at ¶ 24.

Further, Plaintiff Donna Veeder contends that it was clear that "my objections would be futile, just as they had been with respect to my husband's letters." *See id.* at ¶ 25. She contends that no member of the New York State Police asked her if she would grant them permission to search her home and that, had they asked her permission, she would have denied the request. *See id.* at ¶¶ 26-27. Moreover, although Plaintiff Donna Veeder contends that, at no point did she consent to the search of her home, she concedes that, in response to this litigation, Defendants have produced a document, containing her signature, granting them permission to search her home. *See id.* at ¶¶ 28-30. Plaintiff Donna Veeder claims that, although she signed papers during the day, such as a statement with respect to the events that had occurred, she was devastated by what had occurred, rendering her unable to read and simply "signed papers that were placed in front of me after being told what they were." *See id.* at ¶ 32. Plaintiff Donna Veeder asserts that "it is possible that in my distraught condition I signed the purported consent believing it to be something different[,]" and that, if she did sign the document, she was unaware of its content "and certainly never informed that it was a document granting New York State Police permission to search my home." *See id.* at ¶¶ 33-34. Moreover, she claims that Defendants were aware she did not consent to a search of her home "because I specifically said so as we were preparing to leave (after my daughter, Stacy, had returned from the automobile of one of the defendants)." *See id.* at

¶ 36.  In response to these objections, Plaintiff Donna Veeder asserts that "Defendant[s] Nutting and Burns both responded that they did not need a warrant, and [that] my home was going to be searched."  *See id.* at ¶ 39.


## C.    Interviews of Plaintiffs Stacy and Donna Veeder

At some point during the investigation, Defendant Martin was directed to take supporting depositions from Plaintiffs Donna and Stacy Veeder.  *See id.* at ¶ 55.  Since Plaintiff Donna Veeder was otherwise occupied, Defendant Martin, accompanied by another member of the State Police, informed Plaintiff Stacy Veeder that they needed her to give a statement.  *See id.* at ¶ 56; Dkt. No. 67-1 at ¶ 56.  Plaintiff Stacy Veeder was visibly and understandably upset, but she was cooperative.  *See id.* at ¶ 57.  According to Defendants, because there were so many distractions in the house, Defendant Martin suggested that he take Plaintiff Stacy Veeder's statement in his vehicle, which was parked in front of the house.  *See id.* at ¶ 58.  Defendant Martin, who sat in the driver seat, asked Plaintiff Stacy Veeder, who sat in the passenger seat, questions about that morning and the previous night, which he transcribed on a form known as a "General Deposition."  *See id.* at ¶ 59.[6]

During the interview, Defendant Martin asked Plaintiff Stacy Veeder questions about her father, including issues he was having at work, issues he was having with co-workers, issues between her parents, and whether her father had a history of mental illness.  *See id.* at ¶ 60.  When the interview was over, Defendant Martin provided Plaintiff Stacy Veeder with a written statement for her to sign, which she did.  *See id.* at ¶ 61.  After signing the deposition, Plaintiff

---

[6] Plaintiffs admit this allegation, but "[d]eny that his writing was an accurate representation of her responses."  *See* Dkt. No. 67-1 at ¶ 59.

Stacy Veeder returned to the house.  *See id.* at ¶ 62.  The deposition started at approximately 9:25 a.m., and concluded at approximately 9:45 a.m.  *See id.*

At one point during the interview, a woman approached the car on the passenger side.  *See id.* at ¶ 63.  When Plaintiff Stacy Veeder opened the car door, Defendant Martin leaned over the console and advised the woman that Plaintiff Stacy Veeder was giving a statement, but that they were almost done.  *See id.*  Although Defendants contend that Plaintiff Stacy Veeder voluntarily closed the vehicle's door, Plaintiffs contend that Defendant Martin "clearly conveyed to Stacy Veeder that she could not leave the car until she provided a statement."  *See id.* at ¶ 64; Dkt. No. 67-1 at ¶ 64.  Moreover, although Plaintiffs admit that Plaintiff Stacy Veeder never asked to get out of the car during the interview, "Plaintiffs note, however, that acquiescence to a show of authority does not constitute consent."  *See id.* at ¶ 65; Dkt. No. 67-1 at ¶ 65.  Further, although Plaintiff Stacy Veeder was permitted to keep her hand on the car door's handle in case she needed to throw up, Plaintiffs contend that she was "made aware that she was not to leave the vehicle[.]"  *See id.* at ¶ 66; Dkt. No. 67-1 at ¶ 66.

After finishing Plaintiff Stacy Veeder's interview, Defendant Martin interviewed Plaintiff Donna Veeder.  *See id.* at ¶ 67.  Since the family was getting ready to leave the house to stay with a friend, Defendant Martin drove to the friend's house in Guilderland, New York to take Plaintiff Donna Veeder's statement.  *See id.* at ¶ 68.  At the conclusion of Plaintiff Donna Veeder's interview, Defendant Martin provided her with a supporting deposition form that he transcribed during the interview, which she signed and initialed on both pages.  *See id.* at ¶ 69.

**D.      The suicide notes**

May 23, 2008, was the Friday preceding Memorial Day weekend.  *See id.* at ¶ 70.  The

following Tuesday, May 27, 2008, Defendant Port, Defendant Hogan, and an Albany County

Assistant District Attorney had a telephone conference concerning Garry Veeder's letters in the

folder, the issue of privilege, and the fact that the family wanted the letters back.  *See id.*

According to Plaintiffs, Defendant Hogan advised Defendant Port to open and photocopy the

letters.  *See id.* at ¶ 71.  At this point, Defendant Port asked the FIU team to bring him the folders

containing the letters, which were still sealed in an evidence bag.  *See id.* at ¶ 72.  Defendant Port

then opened the bag, reviewed the contents of the letters, found that they were consistent with

suicide notes, and directed that copies be made and the originals returned to the family.  *See id.* at

¶¶ 73-74.

**E.      The Court's March 2, 2012 Memorandum-Decision and Order and Plaintiffs' motion
to amend**

In its March 2, 2012 Memorandum-Decision and Order, the Court granted in part

Defendants' motion for judgment on the pleadings.  *See* Dkt. No. 50.  Specifically, as relevant

here, the Court found that "the only allegation against Defendants Burns, Strack, McDonald,

Gilliam, Valoze, Hard and John Doe1 is that they are all employed, in some capacity, by the New

York State Police. . . .  Plaintiffs do not allege that these Defendants engaged in any of the alleged

unconstitutional conduct, or that they engaged in any conduct that would subject them to

supervisory liability."  *See id.* at 9-10.  As such, the Court dismissed these Defendants from this

action for lack of personal involvement in the alleged unconstitutional conduct.  *See id.* at 10.

In response to the Court's March 2, 2012 Memorandum-Decision and Order, Plaintiffs

moved for reconsideration and, in the alternative, to amend their complaint.  Although the Court

denied Plaintiffs' motion for reconsideration, it granted Plaintiffs' motion to amend their complaint. *See* Dkt. No. 54. Specifically, the Court found that "Plaintiffs have now sufficiently alleged the personal involvement of Defendants Burns, McDonald and Strack, curing the deficiencies discussed in the Court's March 2, 2012 Memorandum-Decision and Order." *See id.* at 12.

Currently before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for partial summary judgment as to liability.

## III. DISCUSSION

**A.  Defendants' motion for summary judgment**

*1. Summary judgment standard*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the

non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Relief under 42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

### 3. Personal involvement

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the

complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation and citations omitted). "'[W]hen monetary damages are sought under § 1983, the [] doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.'" *Id*. (quotation omitted). There is a sufficient showing of personal involvement of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (citations omitted).

### a. Stephen P. Hogan – Search & Seizure

Defendants contend that Plaintiffs have failed to substantiate their conclusory allegations that Defendant Hogan was personally involved in the alleged unconstitutional search and seizure. *See* Dkt. No. 62-33 at 12-13. Specifically, Defendants claims that, "[o]ther than plaintiffs' unsubstantiated allegation, there is no evidence that Attorney Hogan took a telephone call from Senior Investigator Nutting in connection with the investigation into Garry Veeder's death. Senior Investigator Nutting has no recollection of speaking with Attorney Hogan on the day of Garry Veeder's death. . . . Similarly, Attorney Hogan has no recollection of such a telephone call. . . ." *See id.* (internal citations omitted).

Plaintiffs, however, contend that, "[n]otwithstanding Nutting's recent amnesia and Hogan's faulty memory, there is much more than 'plaintiffs' unsubstantiated allegation' that Stephen Hogan took a telephone call from defendant Nutting; Nutting himself stated Hogan took the call." *See* Dkt. No. 67-2 at 6-7. Further, Plaintiffs claim that the evidence shows that Defendant Hogan advised a member of the New York State Police to "'perform a search without consent'" and that he admits that he "'may have told then-Lieutenant Port to copy the letters for the file.'" *See id.* at 7 (citations omitted). Plaintiffs claim that opening and copying the letters constituted a search, that there was no consent or warrant to justify copying the letters, and argue that just because the letters were thought to be suicide notes cannot be construed as an exception to the warrant requirement. *See id.*

Contrary to Defendants' assertions, questions of fact preclude the Court from granting Defendant Hogan summary judgment on this ground. Although Defendant Hogan asserts that he has no recollection of receiving a telephone call from Defendant Nutting on May 23, 2008 and that he would never advise the State Police to conduct a search without a warrant, consent or other

16

exception, Defendant Nutting asserts that he spoke with "our General Counsel's office" that day. Moreover, during his deposition, Defendant Nutting testified that, after he spoke with Plaintiffs' attorney, he called "Division Counsel, our attorneys with the New York State Police." *See* Dkt. No. 66-1 at 70-71. Although he stated that he was not sure if he spoke with Defendant Hogan or another attorney, he stated that it "[c]ould have been Stephen Hogan." *See id.* at 72. Since a determination of whether Defendant Hogan was personally involved in this conduct will necessarily require credibility determinations, it is inappropriate for disposition at the summary judgment stage.

Based on the foregoing, the Court finds that questions of fact preclude granting Defendants' motion for summary judgment on this ground.

### b. Stephen P. Hogan and George Port – opening the letters

Defendants contend they were "unable to find any legal authority for the proposition that opening up letters after they were seized constitutes a Constitutional deprivation. Accordingly, Count XIII does not establish that Attorney Hogan and/or George Port were personally involved in a constitutional violation." *See* Dkt. No. 62-23 at 13.

It is clear that Defendants argument on this point does not go to the personal involvement of Defendants Hogan and Port, but rather to their belief that their act of opening and copying the suicide notes on May 27, 2008 did not constitute a constitutional violation, regardless of whether the initial seizure of the notes was a constitutional violation. As such, this argument will be addressed in the Court's substantive discussion of whether this conduct, construing the facts in Plaintiffs' favor, was a violation of their Fourth Amendment rights.

### c. All Defendants other than Investigator Martin as to Count V

Defendants contend that all Defendants other than Defendant Martin should be dismissed for lack of personal involvement as to Plaintiff Stacy Veeder's false arrest claim based upon Defendant Martin's questioning of her. *See* Dkt. No. 62-23 at 13. "Plaintiffs concede that it appears that defendant Martin acted alone in the seizure of Stacy Veeder." *See* Dkt. No. 67-2 at 8. In light of Plaintiffs' concession and in view of the undisputed facts, the Court finds that Defendant Martin was the only Defendant personally involved in the unconstitutional conduct alleged in Count V. Therefore, Defendants' motion for summary judgment on this ground is granted.

### d. All Defendants other than Nutting and Burns as to seizure of the letters

Defendants contend that Defendants Nutting and Burns were the only Defendants involved in seizing the letters. *See* Dkt. No. 62-23 at 14. Defendants claim that Plaintiff Donna Veeder objected to Defendant Burns regarding turning over the folder containing the letters and, after Defendant Burns advised his supervisor about her objection, she eventually relinquished the folder to Defendant Nutting. *See id.* (citations omitted). Plaintiffs, however, contend that Defendants Nutting, Burns, Hogan and Port were all directly involved with seizing the letters. *See* Dkt. No. 67-2 at 8. Specifically, Plaintiffs contend that Defendant Hogan advised Defendant Nutting, by telephone, to seize and copy the letters. *See id.* at 6-7. Further, Plaintiffs claim that "defendant Port, who was there [in] a supervisory capacity, was apprised at the scene by defendant Nutting that Garry Veeder had left what appeared to be suicide letters to his family and that Donna Veeder objected to the State Police seizing them. Nonetheless, Port authorized their seizure." *See id.* at 8 (citing Port, 46-47).

As Plaintiffs' correctly contend, questions of fact preclude granting Defendants motion on this ground. Defendant Port's statement that he authorized the seizure of the letters, and the questions of fact discussed above regarding whether Defendant Hogan advised the State Police that they could search the residence and seize the letters without consent or a warrant preclude the Court from granting Defendants' motion. *See* Dkt. No. 66-5 at 43-45.

Based on the foregoing, the Court finds that Plaintiffs' have put forth sufficient evidence establishing that Defendants Nutting, Burns, Hogan and Port were all directly involved with seizing the letters.

### e. All Defendants other than Defendants Strack and McDonald as to the search of Plaintiffs' residence

Defendants contend that "[t]here is no evidence that any defendant other than Investigator McDonald and Investigator Strack, both members of the Forensic Identification Unit, searched the scene of Garry Veeder's unattended death. Accordingly, all other defendants should be granted summary judgment on plaintiffs' illegal search claims for lack of personal involvement." *See* Dkt. No. 62-23 at 24 (footnote omitted). Plaintiffs, however, contend that Defendant Burns was personally involved because he "set in motion the illegal search" of their home. *See* Dkt. No. 67-2 at 8. Further, Plaintiffs argue that Defendant Port conceded that he "went through plaintiffs' home," and, therefore, he was personally involved in these claims. *See id.* (citing Port, 38). Moreover, Plaintiffs argue that, similar to Defendant Burns, Defendant Port was present on the scene in a supervisory capacity. *See id.*

Again, issues of fact preclude the Court from granting Defendants' motion on the illegal search claim as to Defendants Strack, McDonald, Burns and Port. As Plaintiffs correctly argue, there is evidence in the record that Defendant Burns "set in motion" the allegedly illegal search

and perhaps failed to stop the search once it became clear that Plaintiff Donna Veeder no longer (if at all) wished to consent to a search of her home. *See* Dkt. No. 62-1 at ¶¶ 46-47. Moreover, Defendant Port testified that he walked through Plaintiffs' residence, accompanied by Defendant Nutting and that he was present at the scene in a supervisory capacity. *See* Dkt. No. 66-5 at 38-40.

As such, questions of fact remain as to whether Defendants Burns and Port were personally involved in the search of Plaintiffs' residence.

### 4. Illegal search under the Fourth Amendment

The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable . . . subject to only a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

It is firmly established that the Fourth Amendment only proscribes unreasonable searches and seizures. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) (citations omitted). The permissibility of a search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id.* (quotation and other citation omitted).

In *Ruggiero v. Krzeminski*, the Second Circuit held that although a search conducted without a warrant is

> presumptively unreasonable . . . [t]he operation of this presumption
> . . . cannot serve to place on the defendant the burden of proving
> that the official action was reasonable. Rather, the presumption

> may cast upon the defendant the duty of producing evidence of
> consent or search incident to an arrest or other exceptions to the
> warrant requirement. However, the ultimate risk of nonpersuasion
> must remain squarely on the plaintiff in accordance with established
> principles governing civil trials.

*Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (internal and other citations omitted).

"To the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*, . . . one 'jealously and carefully drawn' exception . . . recognizes the validity of searches with the voluntary consent of an individual possessing authority[.]" *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (internal quotation and citations omitted); *accord United States v. Matlock*, 415 U.S. 164, 171 (1974); *Koch v. Town of Brattleboro*, 287 F.3d 162, 167 (2d Cir. 2002) (citation omitted). Although mere acquiescence to a police officer's order to allow entry is insufficient to establish consent, voluntary consent can be both express or implied by actions or conduct. *See United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (citations omitted).

The scope of an individual's consent under the Fourth Amendment is a question of fact. *See United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005). The standard for measuring that scope is objective reasonableness, namely, what would a "reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Finally, even after a person has expressly consented to a search of his home, he may subsequently limit or revoke that consent. *See Lavin v. Thornton*, 959 F. Supp. 181, 190 (S.D.N.Y. 1997) (citations omitted).

In the present matter, Defendants have produced a consent form signed by Plaintiff Donna Veeder permitting a search of Plaintiffs' residence. *See* Dkt. No. 62-8 at 8. This consent provides Defendant Burns and "member(s) of the New York State Police [permission] to conduct a search

of" Plaintiffs' "residence and garage." *See id.* The consent form further provides that the "State Police" may search "the entire premises, including the contents of any containers or boxes found thereon." *See id.* Further, the form states that consent is being given freely and voluntarily, that Plaintiff Donna Veeder understands that she does not need to consent to a search, and that "[n]o threats or force were used by any member of the State Police to obtain my consent." *See id.* The consent form is signed by Plaintiff Donna Veeder and indicates that it was signed on May 23, 2008, at 9:34 a.m. *See id.*

Although Plaintiff Donna Veeder does not recall signing the document, she does admit that the signature on the consent form appears to be hers. She contends, however, that she never would have knowingly signed such a document giving the New York State Police authority to search her premises and that, given the mental state she was in at the time, she may have signed this document not knowing what it was. Further, Plaintiff Donna Veeder contends that she repeatedly told Defendants that they she did not consent to them searching her home and that she believed that a warrant was required for what they were doing. *See* Dkt. No. 67-3 at ¶¶ 33-37. Moreover, she contends that in response to her objections, Defendants Nutting and Burns informed her that they did not need a warrant to conduct the search and that the search would be going forward. *See id.* at ¶ 39. Moreover, Plaintiff Donna Veeder contends that, upon talking to her attorney, both she and her attorney informed Defendants that the letters left by Garry Veeder were not to be taken because they were privileged.

Although Defendants did obtain a signed consent form to search Plaintiffs' residence and the items found therein, questions of fact exist as to whether the written consent was freely and voluntarily given in light of Plaintiff Donna Veeder's emotional state. *See United States v. Dunn*, 957 F.2d 499, 503 (7th Cir. 1992) (holding that "the fact that a consenting party is extremely upset

at the time she consents is not dispositive. . . . [A]bsent a showing that her emotional distress was so profound as to impair her capacity for self-determination or understanding of what the police were seeking, it is not enough to tip the balance towards finding that her consent was involuntary" (internal citations omitted)).  Further, questions of fact exist as to when and if Plaintiff Donna Veeder withdrew her consent for the search, thereby requiring Defendants to obtain a warrant to continue with the search.  *See Lavin*, 959 F. Supp. at 190 (citations omitted); *see also United States v. O'Brien*, 498 F. Supp. 2d 520, 537 (N.D.N.Y. 2007) (holding that "[i]f a defendant later withdraws consent, the withdrawal is relevant to whether he earlier understood his right to withhold it" (citations omitted)).

Based on the foregoing, the Court denies Defendants' motion for summary judgment as to Plaintiffs' Fourth Amendment illegal search claim.


### 5. Illegal seizure under the Fourth Amendment

Defendants contend that, because they were validly in Plaintiffs' residence, and because the nature of the suicide notes was readily available, they were entitled to seize the suicide notes under the "plain view doctrine."  *See* Dkt. No. 62-23 at 16-19.  Plaintiffs, however, contend that Defendants were not validly in their residence and, regardless of whether they were permitted to be in their residence, the plain view doctrine is inapplicable to the present matter because this was not a criminal investigation.  *See* Dkt. No. 67-2 at 10-12.

A plain view seizure is authorized if the police are lawfully in a position to view an object, if the object's incriminating character is readily apparent, and if they have a lawful right of access to the object.  *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citations omitted).  The police must have probable cause to believe that the object in plain view is contraband or

constitutes incriminating evidence in order to seize it. *See Arizona v. Hicks*, 480 U.S. 321, 326 (1987).

First, contrary to Plaintiffs' contention, the plain view doctrine has been held to be applicable to investigations into an alleged suicide, even when no criminal activity is suspected. *See Earle v. City of Vail*, 146 Fed. Appx. 990, 994 (10th Cir. 2005) (finding that the plaintiffs' Fourth Amendment rights were not violated because the plain view doctrine permitted the police officers to seize the suicide letters and noting that, "[w]hile the notes were not necessarily incriminating, they were, on their face, directly relevant to the police officers' investigation of Michael Earle's death"). Unlike the situation in *Earle*, however, issues of fact remain as to whether and when Plaintiff Donna Veeder withdrew or otherwise limited her written consent permitting Defendants "to search the entire premises, including the contents of any containers or boxes found thereon." *See* Dkt. No. 62-8 at 8. If Plaintiff Donna Veeder withdrew or otherwise limited her consent, then, depending on when this occurred, Defendants may not have been lawfully in a position to view the object. Moreover, although the letters were addressed to Garry Veeder's family, it is not clear that the object's nature was readily apparent to Defendants.[7]

---

[7] The Court notes that the record is far from clear regarding the time line of events on May 23, 2008. For example, Mr. Kouray testified that he received a call from Plaintiff Donna Veeder at approximately 8:00 a.m. *See* Dkt. No. 66-3 at 11. According to Mr. Kouray, during this call, Plaintiff Donna Veeder informed him that members of the New York State Police were there and that they intended to take items from her home, including the suicide notes. *See id.* at 11-12. However, Defendant Burns, who was the first non-uniformed member of the State Police on scene, testified that he arrived on scene at approximately 8:50 a.m. *See* Dkt. No. 62-1 at ¶ 15. Moreover, Defendant Nutting testified that he arrived shortly after Defendant Burns and that Uniform Trooper Timothy Hard was there as well. *See* Dkt. No. 66-1 at 38. According to Defendants, it was not until after Defendant Nutting arrived and appointed Defendant Burns to lead the investigation that Defendant Burns entered Plaintiffs' house and spoke with Plaintiff Donna Veeder. *See* Dkt. No. 62-1 at ¶¶ 21-25. Defendants claim Plaintiff Donna Veeder went into another room shortly after Defendant Burns first spoke with her and, when she returned to the kitchen, Defendant Burns first informed her that he would need to secure as evidence the folder

(continued...)

Based on the foregoing, the Court denies Defendants' motion for summary judgment on this ground.

### 6. Interrogation of Plaintiff Stacy Veeder

As a general matter "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, [however,] the person approached may not be detained or frisked but may refuse to cooperate and go on his way." *Terry*, 392 U.S. at 34 (White, J., concurring). What little authority exists on this question suggests that police have less authority to detain those who have witnessed a crime for investigatory purposes than to detain criminal suspects. *See* 4 Wayne R. LaFave, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.2(a), at 289 (4th ed. 2004). Accordingly, some courts have prohibited the involuntary detention of witnesses to a crime. *See United States v. Ward*, 488 F.2d 162, 169-70 (9th Cir. 1973) (en banc); *see also United States ex rel. Hampton v. Fews*, 187 F. Supp. 2d 981, 988-90 (N.D. Ill.), *rev'd on other grounds*, 296 F.3d 560 (7th Cir. 2002); *Perkins v. Click*, 148 F. Supp. 2d 1177, 1184 (D.N.M. 2001) (citation omitted); *Orozco v. County of Yolo*, 814 F. Supp. 885, 893 (E.D. Cal. 1993).

The Fourth Amendment protects people from unreasonable searches and seizures. *See* U.S. Const. amend. IV. However, "[n]ot every encounter between a police officer and an individual is a seizure implicating the fourth amendment's protections." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (citation omitted). In order to invoke the Fourth Amendment, a

---

[7](...continued)
with the letters inside. *See id.* at ¶ 28. It was at this point that Plaintiff Donna Veeder first attempted to call Mr. Kouray, but he was not there so she instead spoke with another attorney at his office. *See id.*; Dkt. No. 67-1 at ¶ 28.

plaintiff must demonstrate that, in light of the totality of the circumstances, "a reasonable person would have believed that [s]he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citation omitted). "In other words, a seizure occurs only when a reasonable person would feel restrained by physical force or a show of authority." *Gardiner v. Incorporated Village of Endicott*, 50 F.3d 151, 155 (2d Cir. 1995) (citation omitted). "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554 (citation omitted). As recently held by this Court, "[i]f . . . the encounter with the police occurs in the plaintiff's home, the Court must determine whether a reasonable person in the plaintiff's position would have felt that she was free to disregard the officer and leave her home without consequence." *Clarke v. County of Broome*, No. 1:10-CV-399, 2012 WL 1005086, *7 (N.D.N.Y. Mar. 23, 2012) (citation omitted).

In the present matter, questions of fact prevent the Court from granting Defendants' motion for summary judgment. Plaintiffs were not suspected of engaging in any criminal activity, but were simply questioned as witnesses so that Defendants could obtain information for their investigation. Although Defendants assert that all unattended deaths which appear to be suicides are investigated as possible homicides, Defendants have not once asserted that Plaintiffs were the subject of any criminal investigation or that they were suspected of criminal activity. Despite this, Defendants undoubtedly had an interest in interviewing Plaintiffs for any relevant information they might have surrounding Garry Veeder's death.

Although a brief interrogation to obtain Plaintiffs' names and other basic information (and statements if and when they were willing to provide a deposition statement) could be justified,

there is no indication in this matter that any exigencies were present that would require a detention for investigative purposes. *See Walker*, 451 F.3d at 1149. Although a jury may in fact determine that Plaintiff Stacy Veeder was not "seized" or that a reasonable person would have felt "that she was free to disregard the officer and leave . . . without consequence[,]" *Clarke*, 2012 WL 1005086, at *7, questions of fact exist which preclude the Court from granting Defendants' motion.

Based on the forgoing, the Court denies Defendants' motion for summary judgment on this ground.

### 7. Qualified immunity

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit"). "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that the "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider in either order. *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted).

The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citations omitted). The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "To determine whether a right is clearly established, we look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Schecter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

### a. Defendants Hogan and Port opening the suicide letters

Defendants contend that Defendants Hogan and Port are entitled to qualified immunity for the alleged unlawful search of Garry Veeder's letters that occurred when they opened the letters and photocopied them. *See* Dkt. No. 62-23 at 22. Defendants argue that Plaintiffs cannot establish that a clearly established right was violated. *See id.* Plaintiffs, however, contend that clearly established law establishes that this conduct was an illegal search and, therefore, Defendants should not be awarded qualified immunity. *See* Dkt. No. 67-2 at 15-16 (citation omitted).

In the present matter, the Court agrees with Plaintiffs that Defendants' motion on this ground should be denied. In *United States v. Jacobsen*, the Supreme Court held that,

> [w]hen the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an "effect" within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.

*United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (internal footnotes and citations omitted).

In the present matter, the law was clear at the time that warrantless searches of "[l]etters and other sealed packages" are presumptively unreasonable. *See id.* Even assuming that Defendants lawfully seized this evidence in an effort to preserve it for purposes of their investigation into the death of Garry Veeder, Defendants Hogan and Port's actions cannot be said to be objectively reasonable in light of the facts in dispute. For example, it is unclear whether Defendant Hogan actually spoke with Defendants during the search and, if he did, what the

content of that conversation was. Defendant Hogan stated in his declaration, however, that it would not be his practice to advise any member of the State Police to search or seize evidence without a warrant, consent, or another exception to the warrant requirement. *See* Dkt. No. 62-1 at ¶ 39 (citation omitted). Further, it is unclear whether Defendants Hogan and Port knew the extent and time of Plaintiff Donna Veeder's alleged withdrawal of her written consent. Such questions of fact preclude the Court from granting Defendants' motion for summary judgment on this ground.

### b. Seizure of the letter

Defendants argue that Defendant Nutting is entitled to qualified immunity because he reasonably relied upon the advice of an attorney in securing the letters. *See* Dkt. No. 62-23 at 22.

Again, since the parties dispute who Defendant Nutting spoke with from the New York State Police General Counsel's Office and what the content of that conversation was, Defendant Nutting cannot rely on the argument that he acted under the advice of counsel to warrant the application of qualified immunity. This outcome is further supported by the fact that Plaintiff Donna Veeder's attorney informed him that the letters were privileged and that he was not to seize them and by Plaintiff Donna Veeder's alleged withdrawal of her consent and objection to Defendant Nutting seizing the letters without a warrant.

Based on the foregoing, the Court denies Defendants' motion for summary judgment on this ground.

### c. Search of Plaintiffs' residence

Defendants argue that Defendants McDonald and Strack reasonably relied upon the signed consent to search when they undertook their search and seizure of evidence. *See* Dkt. No. 62-23

at 22. Plaintiffs, however, contend that Defendants McDonald and Strack began the search of the premises prior to receiving the written consent and, therefore, they are not entitled to qualified immunity. *See* Dkt. No. 67-2 at 17. Moreover, Plaintiffs claim that they are not entitled to qualified immunity for their seizure of Plaintiff Donna Veeder's suitcase because "[n]obody could claim that the purported consent authorized the seizure" of the briefcase since it did not contain anything relevant to the investigation. *See id.* Plaintiffs claim that Defendant McDonald admitted that the only reason he seized the briefcase was because it held papers related to Garry Veeder's employment. *See id.* (citation omitted).

Contrary to Plaintiffs' arguments regarding when Defendants Strack and McDonald began their search, the undisputed evidence makes clear that they did not begin their search until after Plaintiff Donna Veeder had signed the written consent. According to the crime scene attendance log, Defendant Strack arrived at the scene at 9:14 a.m., while Defendant McDonald arrived at 9:20 a.m. *See* Dkt. No. 62-11 at 2. Defendants Strack and McDonald both testified that, upon their arrival, they were briefed by members of the State Police who were already at the scene. *See* Dkt. No. 62-5 at ¶ 5; Dkt. No. 62-10 at ¶ 5. After being briefed, Defendant Burns provided Defendants Strack and McDonald with a "Voluntary Consent to Search Certain Premises." *See id.* at ¶ 6; Dkt. No. 62-10 at ¶ 6. The consent form is dated 9:34 a.m. *See* Dkt. No. 62-12 at 2. According to the "Narrative Description" document detailing the search of Plaintiffs' residence, Defendants McDonald and Strack began to log the scene at 9:43 a.m. *See* Dkt. No. 62-14 at 2. Further, the document labeled "Crime Scene Summary – Building" prepared by Defendant Strack, provides that the "time started" was 9:44 a.m. *See* Dkt. No. 62-13 at 2.

Both Defendants Strack and McDonald state that, at no point, were they aware that Plaintiff Donna Veeder objected to the search or to evidence being seized. *See* Dkt. No. 62-10 at

¶ 13; Dkt. No. 62-5 at ¶ 11. Plaintiffs do not contend that they ever personally objected to Defendants Strack and McDonald regarding the search, and they do not contend that any other person informed them that Plaintiff Donna Veeder had withdrawn her consent for the search. In fact, Plaintiffs assert that Defendant Nutting knew that Plaintiff Donna Veeder objected to the search, knew that Defendants Strack and McDonald were about to search the residence, but "[r]ather than telling Strack and McDonald that the search would be illegal he permitted [it] to go forward." *See* Dkt. No. 67-2 at 9. Plaintiffs only argument on this point provides as follows: "Plaintiffs concede that they have no direct evidence proving that defendants Strack and McDonald were not unaware that no consent had been given for the *search* of their home, however, . . . by virtue of the discrepancies surrounding when they began the search and the times indicated by various defendants on documents they prepared, a very strong inference can be drawn that Strack and McDonald were well aware that legitimate consent to search the home had not been obtained." *See id.* The Court, however, disagrees that these alleged inconsistencies create a "strong inference" that Defendants Strack and McDonald knew that Plaintiff Donna Veeder objected to the search. Rather, the Court finds that Plaintiffs have failed to put forth any evidence that precludes the Court from granting summary judgment on this ground. Plaintiffs' conjecture and theories, unsupported by any admissible evidence, are insufficient to defeat Defendants' motion for summary judgment.

Moreover, Defendants Strack and McDonald were aware that Defendants had taken possession of the suicide letters (or what were believed to be suicide letters) prior to their arrival. Again, nothing in the record suggests that Defendants Strack and McDonald were aware that Plaintiff Donna Veeder objected to this seizure. Therefore, an objectively reasonable officer would believe that the consent would permit them to seize evidence they believed to be relevant to

their investigation. Further, it was objectively reasonable for them to believe that Plaintiff Donna Veeder's briefcase, which contained documents related to Garry Veeder's work with the New York State Police, would be relevant in light of the recent events that caused Garry Veeder to leave his job.

Based on the foregoing, the Court finds that Defendants Strack and McDonald are entitled to qualified immunity because the undisputed facts establish that it was objectively reasonable for them to believe that their conduct did not violate Plaintiffs' constitutional rights.[8]

### d. Interrogation of Plaintiff Stacy Veeder

Defendants contend that Defendant Martin is entitled to qualified immunity regarding his interview of Plaintiff Stacy Veeder because he "reasonably relied upon plaintiff Stacy Veeder's acquiescence to give a statement and failure to object or ask to leave." *See* Dkt. No. 62-23 at 22. Plaintiffs, however, assert that Plaintiff Stacy Veeder did not "acquiesce" to a request, but rather "she fearfully submitted to his commands and show of authority." *See* Dkt. No. 67-2 at 18.

During her deposition, Plaintiff Stacy Veeder indicated that she was in the car for approximately thirty (30) minutes and that she never asked Defendant Martin if she could exit the vehicle. *See* Dkt. No. 62-22 at 7. Although she indicated that she did not ask to exit the vehicle at

---

[8] Although the Court is granting Defendants' motion as to Defendants Strack and McDonald on qualified immunity grounds, Defendants have not presented any argument as to whether Defendants Port and Burns are entitled to qualified immunity for their role in the search of Plaintiffs' residence. Since the Court has dismissed the illegal search claim against Defendants Strack and McDonald on qualified immunity grounds and not on the merits, Plaintiffs may still proceed with their claim relating to the illegal search of their residence against Defendants Port and Burns. Even had Defendants moved for qualified immunity as to Defendants Burns and Port, the Court would have denied the motion since Plaintiffs allege that Defendants Burns and Port knew that they objected to the search of their residence and seizure of any items therein, and yet these Defendants still permitted the search to go forward without first obtaining a warrant.

any point during the interview, Plaintiff Stacy Veeder qualified her response as follows:

A.    At one point, my mother's friend, Juliann, came over to the car, and in order to speak with her since the windows were up, I opened – I attempted to open the door and the plain-clothed man – I couldn't get anything out to her. I couldn't talk to her because the plain-clothed man was talking over me and saying something to the effect of she has to give a statement, she is almost done, which, to me, I was very afraid and that, to me, meant along with the fact that I was told I had to make a statement, that I was in that car to make a statement and that I felt that I was not going to be able to leave that car until something adequate to whatever he wanted was, you know, achieved.

Q.    So you said you tried to open the car door?

A.    I did open the car door.

Q.    Okay.  And is that when – well, then, what did the investigator say, do you remember?

A.    He reached across me, because it was the passenger's door, trying to grab the – you know, like in a motion to grab the bar or handle that you would open the door with, and then was speaking across me to Juliann, my mother's friend, who was outside, she had a cup of water or something, telling her she has to give a statement, you know, she will be done like soon.

Q.    Okay.  Now, when you say he reached across you, what do you mean by that?

A.    I mean, if he is sitting here and I'm sitting here, his hand coming over as I'm opening the door to try to indicate to me, you know, that I'm not leaving the car, because the door – I was in the process of opening the door and I immediately felt that I was not – that it was not an option for me to be leaving the car.

* * * * *

Q.    Did he tell you that, that you couldn't leave the car without signing [the written statement]?

A.    No.

Q.    And at no point in that car did you ask to leave the car, did you?

34

A. No.

Q. And did you – other than when Juliann came to the car and said you would be done shortly, did you make any attempt to exit the car?

A. I remember having my hand on the handle because I thought I was going to throw up, and then I later did throw up multiple times, I didn't open the door, but I remember holding it there.

Q. Were you prevented from doing that?

A. No.

*See id.* at 7-8, 10-11. After Plaintiff Stacy Veeder signed the written statement prepared by Defendant Martin, she testified that she walked back to the house and proceeded to go upstairs. *See id.* at 11.

According to Defendant Martin's affidavit, after being directed to take Plaintiff Stacy Veeder's statement, he approached her and advised her of his intention. *See* Dkt. No. 62-2 at ¶ 5. Further, he states that Plaintiff Stacy Veeder "was visibly and understandably upset, but she was cooperative. Because there were so many distractions in the house, I suggested that I take her statement in my car, which was parked in front of the residence. Ms. Veeder agreed." *See id.* at ¶ 6.

In light of Plaintiff Stacy Veeder's testimony and Defendant Martin's uncontested statements, the Court finds that a reasonable officer in Defendant Martin's position would not understand that his actions violated Plaintiff Stacy Veeder's rights. As the testimony makes clear, Defendant Martin acted reasonably throughout the entire interview. Plaintiffs do not contend that Defendant Martin conducted the interview in his vehicle for any reason other than because there were so many distractions in the house. Moreover, Plaintiff Stacy Veeder willingly accompanied him to his vehicle when asked and never requested that she be permitted to leave or that the interview take place at some other time. Further, Plaintiff Stacy Veeder testified that she was

allowed to keep her hand on the door handle, an indication that she could have exited the vehicle at any time. Any reasonable officer would believe that any uneasiness or anxiety on Plaintiff Stacy Veeder's part was not due to the officer's actions in conducting the interview, but because of the traumatic events she witnessed that morning.

Based on the foregoing, the Court finds that a reasonable officer in Defendant Martin's position would not understand that his actions violated Plaintiff Stacy Veeder's right; and, therefore, Defendants' motion for summary judgment as to Defendant Martin on qualified immunity grounds is granted.

## B.      Plaintiffs' motion for summary judgment

Since the same factual disputes discussed in the Court's disposition of Defendants' motion for summary judgment raise triable issues with respect to Plaintiffs' motion, the Court denies Plaintiffs' motion for summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**;[9] and the Court further

**ORDERS** that Plaintiffs' motion for summary judgment is **DENIED**; and the Court

_____

[9] Defendants' motion for summary judgment is granted as to the following Defendants and claims: (1) Plaintiffs' illegal seizure claim relating to the interview of Plaintiff Stacy Veeder by Defendant Martin (Count V); and (2) the claims against Defendants Strack and McDonald relating to the search of Plaintiffs' residence.

further

**ORDERS** that Defendants **Martin, Strack and McDonald** are **DISMISSED** from this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 29, 2013
      Albany, New York

Mae A. D'Agostino
U.S. District Judge