**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONNA VEEDER, STACY VEEDER and**
**BRENDAN VEEDER,**

                                   **Plaintiffs,**

         **vs.**                                              **1:10-cv-665**
                                                             **(MAD/CFH)**

**STEVEN NUTTING, Individually and in his**
**Official Capacity as an Investigator for the**
**New York State Police; DAVID BURNS,**
**Individually and in their Official Capacity as**
**Investigators for the New York State Police;**
**GEORGE PORT, Individually and in their**
**Capacity as Lieutenants for the New York State**
**Police; and STEPHEN HOGAN, Individually**
**and in their Capacity as an Attorney for the New**
**York State Police,**

                                   **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**OFFICE OF KEITH F. SCHOCKMEL**          **KEITH F. SCHOCKMEL, ESQ.**
4 Atrium Drive
Suite 290, Executive Woods
Albany, New York 12205
Attorneys for Plaintiffs

**OFFICE OF THE NEW YORK**               **KELLY L. MUNKWITZ, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

# I. INTRODUCTION[1]

On June 8, 2010, Plaintiffs commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants acted in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. *See* Dkt. No. 1. On May 6, 2011 and May 17, 2011, respectively, Plaintiffs filed a first and second amended complaint. *See* Dkt. Nos. 25 and 27.

In a March 2, 2012 Memorandum-Decision and Order, the Court granted in part and denied in part Defendants' partial motion for judgment on the pleadings. *See* Dkt. No. 50. Specifically, the Court dismissed Plaintiffs' claims against the New York State Defendants in their official capacities and dismissed Defendants Burns, Strack, McDonald, Gilliam, Valoze, Hard and John Doe1 for lack of personal involvement. *See id.* at 16. Thereafter, in an April 24, 2012 Memorandum-Decision and Order, the Court denied Plaintiffs' motion for reconsideration, but allowed Plaintiffs to amend their complaint. *See* Dkt. No. 54. Specifically, the Court found that the proposed amended complaint sufficiently alleges the personal involvement of Defendants Burns, McDonald and Strack, thereby curing the deficiencies discussed in the Court's March 2, 2012 Memorandum-Decision and Order. *See id.* at 12.

Thereafter, Plaintiff and Defendants each moved for summary judgment. *See* Dkt. Nos. 61 & 62. In a March 29, 2013 Memorandum-Decision and Order, the Court denied Plaintiffs' motion and granted in part and denied in part Defendants' motion. *See* Dkt. No. 69. Specifically, the Court granted Defendants' motion as to the following Defendants' and claims: (1) Plaintiff's illegal seizure claim relating to the interview of Plaintiff Stacy Veeder by Defendant Martin; and

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

(2) the claims against Defendants Strack and McDonald relating to the search of Plaintiff's residence. *See id.* at 36 n.9. As such, Defendants Martin, Strack and McDonald were dismissed from this case. *See id.* at 37.

Currently before the Court are Plaintiffs' and Defendants' cross-motions for reconsideration of the Court's March 29, 2013 Memorandum-Decision and Order. *See* Dkt. Nos. 71 & 72.

## II. BACKGROUND[2]

### A. Relevant background

On or about May 23, 2008, Plaintiff Donna Veeder awoke between 7:00 and 7:30 a.m., and discovered that her husband, Garry Veeder, was not in bed. *See* Dkt. No. 62-1 at ¶ 5. Plaintiff Donna Veeder looked for her husband and found a Post-It note on the back door that read "I am in the garage." *See id.* at ¶ 6. Plaintiff Donna Veeder exited the house and crossed the deck to the garage, where she found her husband hanging with a plastic bag over his head. *See id.* at ¶ 7.

At this point, Plaintiff Donna Veeder screamed for her daughter, Plaintiff Stacy Veeder, who was asleep upstairs in the home. *See id.* at ¶ 8. Plaintiff Stacy Veeder ran to the garage and saw her father hanging by a rope. *See id.* at ¶ 9. At this point, Plaintiff Donna Veeder told her daughter to call 911, which she did. *See id.* at ¶ 10. The EMTs and the Albany County Sheriff's Department were the first to respond to the 911 call at approximately 8:00 a.m. *See id.* at ¶ 11.

Defendant Steven Nutting was on his way to work on the morning of May 23, 2008, when

---

[2] Unless otherwise noted, the facts contained in the "Background" section of this Memorandum-Decision and Order are not in dispute.

he received a call from New York State Police Troop G Headquarters in Loudonville, New York. *See id.* at ¶ 13. He was directed to report to the scene of an unattended death of a New York State Police lab employee, *i.e.*, Garry Veeder. *See id.* at ¶ 13. As he was responding to the scene, Defendant Nutting called Defendants Burns and Martin and directed both investigators to report to the scene. *See id.* at ¶ 14.

Defendant Burns was the first non-uniformed member of the State Police at the scene. *See id.* at ¶ 15. Defendant Burns arrived at approximately 8:50 a.m., almost an hour after members of the Albany County Sheriff's Department arrived. *See id.* When he arrived, he saw Timothy Hard and various members of the Albany County Sheriff's Department in the driveway. *See id.*

Members of the Albany County Sheriff's Department briefed Defendant Burns on what they knew, including the fact that it appeared that Garry Veeder hanged himself in his garage. *See id.* at ¶ 16. Further, Defendant Burns was advised that Garry Veeder was a civilian employee of the New York State Police and that the Sheriff's Department was willing to turn its investigation over to the State Police. *See id.* Defendant Burns was also informed that Garry Veeder appeared to have left letters for the members of his family. *See id.* at ¶ 17; *but see* Dkt. No. 67-1 at ¶ 17 (denying any inference indicating that anyone knew at that point the content of the letters because they were still sealed in their envelopes).

Defendant Nutting arrived at the scene approximately five-to-ten minutes after Defendant Burns. *See id.* at ¶ 18. Defendant Burns and Craig Apple, Undersheriff for the Albany County Sheriff's Department, briefed Defendant Nutting about the situation. *See id.* at ¶ 19. They informed Defendant Nutting about the existence of the letters and Undersheriff Apple confirmed that Garry Veeder was a civilian employee with the State Police. *See id.*

According to Defendants, because Garry Veeder was a civilian employee with the State

Police, Undersheriff Apple offered to turn the investigation over to Defendant Nutting, which Defendant Nutting accepted. *See id.* at ¶ 20. Further, Defendants claim that, "[g]enerally, when an investigation concerns an employee of a law enforcement agency, that agency assumes control over the investigation." *See id.* Defendant Nutting subsequently appointed Defendant Burns as lead investigator. *See id.* at ¶ 21.[3]

After being advised that Garry Veeder's wife was in the house, Defendant Burns entered the house through the back door to speak to her. *See id.* at ¶ 22. Defendant Burns found Plaintiff Donna Veeder in her kitchen speaking with Albany County Sheriff Investigator Higgins. *See id.* at ¶ 23. Investigator Higgins introduced Defendant Burns to Plaintiff Donna Veeder. *See id.* Defendant Burns advised Plaintiff Donna Veeder that the State Police were taking over the investigation. *See id.* at ¶ 24. Initially, Plaintiff Donna Veeder was upset to hear that the State Police were taking over the investigation because of her belief that the State Police drove her husband to suicide. *See id.* Defendant Burns explained that he did not know Garry Veeder and that he merely wanted to rule out criminality in connection with Mr. Veeder's death. *See id.*

At this point, Plaintiff Donna Veeder had paperwork sitting in front of her on the kitchen table, which she proceeded to take into another room. *See id.* at ¶ 25; Dkt. No. 67-1 at ¶ 25. Defendant Burns was advised that Garry Veeder had left letters to his family and, although the envelopes were still sealed, they believed that they may be relevant to their investigation. *See id.*; Dkt. No. 67-1 at ¶ 25.

When Plaintiff Donna Veeder returned to the kitchen table to continue talking to the investigators, Defendant Burns informed her that he would need to secure as evidence the folder

---

[3] At this point, the parties' recollections of the events that transpired begins to differ substantially.

with the letters inside in the investigation into her husband's death.  *See id.* at ¶ 26.  Plaintiff

Donna Veeder advised Defendant Burns that she would like to contact her attorney and proceeded

to do so.  *See id.* at ¶ 27.  Defendant Burns then spoke with Plaintiff Donna Veeder's attorney,[4]

who advised Defendant Burns that the letters to Plaintiff Donna Veeder and himself were not to

be seized by the State Police.  *See id.* at ¶ 28.  Defendant Burns informed Plaintiffs' attorney that

he was "going to secure the stuff" and that the attorney could address the issue with his bosses.

*See* Dkt. No. 67-1 at ¶ 28 (citation omitted).

At this point, Defendant Burns went outside to advise his supervisor, Defendant Nutting,

about the issues regarding the letters.  *See* Dkt. No. 62-1 at ¶ 30.  Defendant Nutting then entered

the house to speak to Plaintiff Donna Veeder and informed her that they needed to secure the

letters as part of their investigation.  *See id.* at ¶ 31; Dkt. No. 67-1 at ¶ 31.  Plaintiff Donna

Veeder again objected and argued that securing the letters was unnecessary because her husband's

death was obviously a suicide.  *See id.* at ¶ 32.  Defendant Nutting explained to her that all death

investigations are considered homicides until all the evidence is collected and reviewed, and that

such evidence will include letters, physical evidence from the immediate scene and autopsy

results.  *See id.* at ¶ 33.[5]  At no point did Defendants attempt to obtain a search warrant.

---

[4] Although Defendants identify the attorney as Steven Kouray, Plaintiffs state that it was an attorney from Steven Kouray's office, and believe that it was Brian Mercy.  *See* Dkt. No. 62-1 at ¶ 28; Dkt. No. 67-1 at ¶ 28.

[5] Plaintiffs admit that Defendant "Nutting told Donna Veeder that he could take anything he wanted" but "[d]eny that there was any suspicion on any defendant's part that evidence of a crime was present at the Veeder residence."  *See* Dkt. No. 67-1 at ¶ 33.  Throughout their response, Plaintiffs repeatedly contend that Defendants inappropriately characterize their presence at Plaintiffs' home as an "investigation" and complain that Defendants are implying that there was evidence of criminal activity or that they ever suspected such.  Therefore, many of the denials in Plaintiffs' response to Defendants' statement of material facts do not deny the substance of Defendants' assertion, but simply object to any implication that they suspected criminal activity in relation to Garry Veeder's suicide.

Eventually, Plaintiff Donna Veeder relinquished the folder containing the letters and then called her attorney. *See id.* at ¶ 34. Defendant Nutting stepped outside to give Plaintiff Donna Veeder privacy for her telephone call. *See id.* at ¶ 35. Upon speaking with her attorney, Steven Kouray, Mr. Kouray spoke with Defendant Nutting and informed him that "under no circumstances was that stuff [the letters] to leave the house[.]" *See* Dkt. No. 67-1 at ¶ 35. Mr. Kouray asserted spousal and attorney/client privilege as his grounds for denying Defendant Nutting access to the letters. *See id.*

According to Defendant Nutting, the objection to his seizure of the letters presented him with a novel issue and, therefore, he contacted both Division Counsel's Office and the Albany County District Attorney's Office. *See* Dkt. No. 62-1 at ¶ 36. Defendant Stephen P. Hogan, First Deputy Counsel for the New York State Police, does not recall any conversation with Defendant Nutting concerning Garry Veeder. *See id.* at ¶ 38. Defendant Hogan stated in his declaration, however, that it would not be his practice to advise Defendant Nutting, or any member of the State Police, to search or seize evidence without a warrant, consent, or another exception to the warrant requirement. *See id.* at ¶ 39 (citation omitted). Plaintiffs, however, contend that Defendant Port testified that, pursuant to Defendant Hogan's direction, he searched (opened) Plaintiffs' property. *See* Dkt. No. 67-1 at ¶ 39. Further, Plaintiffs claim that Defendant Nutting averred in his answer to the initial complaint that he "'followed legal advice [in seizing the letters], and placed the envelopes in a sealed evidence bag,'" and that Defendant Nutting subsequently identified Defendant Hogan as the individual who provided him with this "legal advice." *See id.* (quotation omitted). After the letters were sealed in an evidence bag, Defendant Nutting provided the letters to Defendant Kelly Strack, a member of the Forensic Identification Team ("FIU"), and did not see the folder or letters after relinquishing them to her. *See* Dkt. No.

62-1 at ¶ 41.

## B.     The search of the residence

Defendants Drew McDonald and Kelly Strack, members of the FIU, were also assigned to investigate the unattended death of Garry Veeder. *See id.* at ¶¶ 42-43. The FIU is a support unit that assists the State Police, Sheriff's Departments, and local police agencies with documentation, collection, preservation and processing of physical evidence and crime scenes. *See id.* at ¶ 44.

When Defendants Strack and McDonald arrived at the Veeders' residence, they were briefed in the driveway by State Police members already at the scene. *See id.* at ¶ 45. They were advised that Plaintiff Donna Veeder found a Post-It note on the inside of the back door advising that her husband was in the garage, and that when she entered the garage, she found her husband hanging from a rope with a plastic bag over his head. *See id.*

Prior to processing the scene, Defendant Strack and/or Defendant McDonald asked Defendant Burns whether they had consent to search or whether they needed a warrant. *See id.* at ¶ 46. At this point, Defendant Burns returned to the house to ask Plaintiff Donna Veeder if she would consent to the search. *See id.* at ¶ 47. Defendant Burns provided Plaintiff Donna Veeder with the consent form, which she signed. *See id.* Defendants McDonald and Strack were provided with Plaintiff Donna Veeder's written consent and began processing the scene at approximately 9:44 a.m. *See id.* at ¶¶ 49, 52. Defendants Strack and McDonald commenced by photographing the property and then proceeded to work their way into the garage and house. *See id.* at ¶ 51. During the search, Defendant McDonald discovered and seized an attache case, which, according to Defendants, "contained documents that appeared to establish that Garry Veeder was having problems at work. Because problems at work would tend to support a

conclusion of suicide, Investigator McDonald secured the attache case as evidence." *See id.* at ¶ 53.

Plaintiff Donna Veeder's rendition of the search of her residence differs considerably from Defendants'. According to Plaintiff Donna Veeder, after her daughter returned to the residence after giving her statement, Defendants Nutting and Burns informed her that she and her family needed to leave the residence because "they intended to search [her] home and [she] could not be present." *See* Dkt. No. 67-3 (Aff. of Donna Veeder dated Aug. 14, 2012) at ¶ 20. Plaintiff Donna Veeder claims that she then informed Defendants Nutting and Burns that she believed that they needed a warrant, "to which Nutting responded, shouting, to the effect that he could do anything he wanted as my house was a 'crime scene.'" *See id.* at ¶ 21. Moreover, she claims that Defendant Nutting added that if the Veeders refused to leave, he would "tape off" their home and prevent their reentry. *See id.* at ¶ 22. Furthermore, she claims that Defendant Burns "screamed at [her] that he would go through every room and every item in [their] home and [the Veeders] would be unable to get back into it for days." *See id.* at ¶ 23. Plaintiff Donna Veeder claims that, at this point, she was feeling extremely ill and "no longer able to battle with defendants." *See id.* at ¶ 24.

Further, Plaintiff Donna Veeder contends that it was clear that "my objections would be futile, just as they had been with respect to my husband's letters." *See id.* at ¶ 25. She contends that no member of the New York State Police asked her if she would grant them permission to search her home and that, had they asked her permission, she would have denied the request. *See id.* at ¶¶ 26-27. Moreover, although Plaintiff Donna Veeder contends that, at no point did she consent to the search of her home, she concedes that, in response to this litigation, Defendants have produced a document, containing her signature, granting them permission to search her

home. *See id.* at ¶¶ 28-30. Plaintiff Donna Veeder claims that, although she signed papers during the day, such as a statement with respect to the events that had occurred, she was devastated by what had occurred, rendering her unable to read and simply "signed papers that were placed in front of me after being told what they were." *See id.* at ¶ 32. Plaintiff Donna Veeder asserts that "it is possible that in my distraught condition I signed the purported consent believing it to be something different[,]" and that, if she did sign the document, she was unaware of its content "and certainly never informed that it was a document granting New York State Police permission to search my home." *See id.* at ¶¶ 33-34. Moreover, she claims that Defendants were aware she did not consent to a search of her home "because I specifically said so as we were preparing to leave (after my daughter, Stacy, had returned from the automobile of one of the defendants)." *See id.* at ¶ 36. In response to these objections, Plaintiff Donna Veeder asserts that "Defendant[s] Nutting and Burns both responded that they did not need a warrant, and [that] my home was going to be searched." *See id.* at ¶ 39.

**C.    Interviews of Plaintiffs Stacy and Donna Veeder**

At some point during the investigation, Defendant Martin was directed to take supporting depositions from Plaintiffs Donna and Stacy Veeder. *See id.* at ¶ 55. Since Plaintiff Donna Veeder was otherwise occupied, Defendant Martin, accompanied by another member of the State Police, informed Plaintiff Stacy Veeder that they needed her to give a statement. *See id.* at ¶ 56; Dkt. No. 67-1 at ¶ 56. Plaintiff Stacy Veeder was visibly and understandably upset, but she was cooperative. *See id.* at ¶ 57. According to Defendants, because there were so many distractions in the house, Defendant Martin suggested that he take Plaintiff Stacy Veeder's statement in his vehicle, which was parked in front of the house. *See id.* at ¶ 58. Defendant Martin, who sat in the

driver seat, asked Plaintiff Stacy Veeder, who sat in the passenger seat, questions about that morning and the previous night, which he transcribed on a form known as a "General Deposition." *See id.* at ¶ 59.[6]

During the interview, Defendant Martin asked Plaintiff Stacy Veeder questions about her father, including issues he was having at work, issues he was having with co-workers, issues between her parents, and whether her father had a history of mental illness. *See id.* at ¶ 60. When the interview was over, Defendant Martin provided Plaintiff Stacy Veeder with a written statement for her to sign, which she did. *See id.* at ¶ 61. After signing the deposition, Plaintiff Stacy Veeder returned to the house. *See id.* at ¶ 62. The deposition started at approximately 9:25 a.m., and concluded at approximately 9:45 a.m. *See id.*

At one point during the interview, a woman approached the car on the passenger side. *See id.* at ¶ 63. When Plaintiff Stacy Veeder opened the car door, Defendant Martin leaned over the console and advised the woman that Plaintiff Stacy Veeder was giving a statement, but that they were almost done. *See id.* Although Defendants contend that Plaintiff Stacy Veeder voluntarily closed the vehicle's door, Plaintiffs contend that Defendant Martin "clearly conveyed to Stacy Veeder that she could not leave the car until she provided a statement." *See id.* at ¶ 64; Dkt. No. 67-1 at ¶ 64. Moreover, while Plaintiffs admit that Plaintiff Stacy Veeder never asked to get out of the car during the interview, "Plaintiffs note, however, that acquiescence to a show of authority does not constitute consent." *See id.* at ¶ 65; Dkt. No. 67-1 at ¶ 65. Further, although Plaintiff Stacy Veeder was permitted to keep her hand on the car door's handle in case she needed to throw up, Plaintiffs contend that she was "made aware that she was not to leave the vehicle[.]" *See id.* at

---

[6] Plaintiffs admit this allegation, but "[d]eny that his writing was an accurate representation of her responses." *See* Dkt. No. 67-1 at ¶ 59.

¶ 66; Dkt. No. 67-1 at ¶ 66.

After finishing Plaintiff Stacy Veeder's interview, Defendant Martin interviewed Plaintiff Donna Veeder. *See id.* at ¶ 67. Since the family was getting ready to leave the house to stay with a friend, Defendant Martin drove to the friend's house in Guilderland, New York to take Plaintiff Donna Veeder's statement. *See id.* at ¶ 68. At the conclusion of Plaintiff Donna Veeder's interview, Defendant Martin provided her with a supporting deposition form that he transcribed during the interview, which she signed and initialed on both pages. *See id.* at ¶ 69.

**D.     The suicide notes**

May 23, 2008, was the Friday preceding Memorial Day weekend. *See id.* at ¶ 70. The following Tuesday, May 27, 2008, Defendant Port, Defendant Hogan, and an Albany County Assistant District Attorney had a telephone conference concerning Garry Veeder's letters in the folder, the issue of privilege, and the fact that the family wanted the letters back. *See id.* According to Plaintiffs, Defendant Hogan advised Defendant Port to open and photocopy the letters. *See id.* at ¶ 71. At this point, Defendant Port asked the FIU team to bring him the folders containing the letters, which were still sealed in an evidence bag. *See id.* at ¶ 72. Defendant Port then opened the bag, reviewed the contents of the letters, found that they were consistent with suicide notes, and directed that copies be made and the originals returned to the family. *See id.* at ¶¶ 73-74.

**E.     The Court's March 29, 2013 Memorandum-Decision**

In a March 29, 2013 Memorandum-Decision and Order, the Court denied Plaintiffs' motion for summary judgment and granted in part and denied in part Defendants' motion for

summary judgment.  *See* Dkt. No. 69.  Specifically, the Court granted Defendants' motion for summary judgment as to the following Defendants and claims: (1) Plaintiffs' illegal seizure claim relating to the interview of Plaintiff Stacy Veeder by Defendant Martin (Count V); and (2) the claims against Defendants Strack and McDonald relating to the search of Plaintiffs' residence.  *See id.*

**F.      Defendants' motion for reconsideration**

In their motion for reconsideration, Defendants "request reconsideration of that portion of this Court's March 29, 2013 Memorandum-Decision and Order that denied summary judgment to [D]efendants Stephen Hogan ("Attorney Hogan") and George Port ("Captain Port")."  *See* Dkt. No. 71-1 at 1.  "Defendants further request reconsideration of the Court's denial of summary judgment to Stephen Nutting ("Sr. Inv. Nutting") and David Burns ("Inv. Burns") on the grounds of qualified immunity with respect to their seizure of the suicide letters and to Attorney Hogan and Captain Port with respect to opening the suicide letters."  *See id.*

With respect to Defendant Hogan, Defendants argue that the Court improperly assumed that he was the attorney to whom Defendant Nutting spoke when he called Division Counsel's Office.  *See id.*  Further, Defendants assert that the Court erred when it assumed that Defendant Hogan directed Defendant Nutting to search and/or seize Plaintiff's property.  *See id.* at 1-2.  Defendants assert that neither assumption is supported by admissible evidence.  *See id.* at 2.  Similarly, as to Defendant Port, Defendants argue that the only admissible evidence established that he was never advised that Plaintiffs had objected to the search or seizure.  *See id.* at 3.

Next, Defendants assert that the Court erred in denying their motion for summary judgment as to the seizure of the letters because Defendants Burns was validly in the house when

he first saw the letters and their nature was evidence to him "based upon Investigator Higgins' statement that they were suicide letters." *See id.* (citing Dkt. No. 62-7 at ¶ 8). Finally, as to the opening of the letters, Defendants argue that the Court improperly found that it was unclear whether Defendant Hogan and Port knew that Plaintiff Donna Veeder had revoked her written consent. *See id.* Defendants contend that there is no admissible evidence before the Court to demonstrate that either Defendant Hogan or Defendant Port was ever aware that Plaintiffs "objected on any ground other than privilege." *See id.* As such, they could not have reasonably believed that their actions were unlawful under the Fourth Amendment and, therefore, the Court's decision to deny them qualified immunity was clear error. *See id.*

## G.    Plaintiffs' motion for reconsideration

In Plaintiffs' motion for reconsideration, they ask the Court to reconsider the March 29, 2013 Memorandum-Decision and Order insofar as it denied their motion for summary judgment and granted in part Defendants' motion for summary judgment. *See* Dkt. No. 72-2 at 2. Alternatively, Plaintiffs ask the Court to direct entry of final judgment as to Defendants Martin, McDonald and Strack, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, so that they may immediately appeal the Court's dismissal of these Defendants. *See id.* at 15-16.

As to the motion for reconsideration, Plaintiffs argue that the parties' statements of material facts unambiguously establish that Defendants Nutting and Burns took from Plaintiff Donna Veeder, over her objection, a folder containing sealed envelopes. *See id.* at 2 (citing Dkt. Nos. 61-2 and 66-8). Further, Plaintiffs argue that the facts also "conclusively establish that the folder and envelopes did not have an immediately apparent incriminating nature." *Id.* As such, Plaintiffs claim that the Court erred in finding that factual disputes preclude granting their motion

14

for summary judgment on this issue.  *See id.*

Next, Plaintiffs argue that Defendants' admission that they opened and photocopied the letters renders them liable.  *See id.* at 7.  Plaintiffs claim that Defendants' excuse for opening the envelopes – *i.e.*, that the envelopes "may have contained" material relevant to their investigation – is legally insufficient.  *See id.*  Plaintiffs claim that Defendants Port and Hogan knew that Plaintiff Donna Veeder did not consent to the seizure of the letters and that they also knew there was no consent to open and copy the letters after they were improperly seized.  *See id.* at 8.  Since this was not a criminal investigation and because the nature of the letters, which were sealed in envelopes, was not plainly evidence, Defendants cannot rely on the plain view doctrine to justify the warrantless seizure.  *See id.* at 7-8.

Next, Plaintiffs argue that neither Defendant McDonald nor Defendant Strack could have reasonably believed that they had consent to seize Plaintiff Donna Veeder's briefcase.  *See id.* at 9.  Plaintiffs claim that the consent form only authorized a search of the residence; it did not authorize the seizure of any objects absent some other justification for such a seizure.  *See id.*  Plaintiffs assert that they are not required to demonstrate that they made Defendants aware of their objection to a warrantless seizure; rather, Defendants are required to demonstrate that they reasonably believed that, despite the lack of a warrant, the seizure was legal.  *See id.* at 10.  They claim that while the other Defendants may have kept Defendants Strack and McDonald in the dark about Plaintiffs' "vigorous protests to the seizure of the folder, there is nothing in the record to support the conclusion that they believed [P]laintiffs consented to the seizure of anything in the home."  *See id.*  Further, Plaintiffs argue that since no reasonable police officer could have believed that Plaintiff Donna Veeder consented to the seizure of her briefcase, Defendants Strack and McDonald are not entitled to qualified immunity.  *See id.* at 12.

Thereafter, Plaintiffs assert that any reasonable police officer would understand that Defendant Martin's actions clearly conveyed to Plaintiff Stacy Veeder that she was not free to leave his car. *See id.* at 13-15. Plaintiffs claim that the Court erred in dismissing this claim against Defendant Martin on qualified immunity grounds because, among other reasons, "[a]ny reasonable police officer would understand that blocking Stacy Veeder with his arm when she opened the car door would clearly convey to her that she was not free to leave." *See id.* at 15.

Finally, should the Court deny Plaintiffs' motion for reconsideration, they ask the Court to enter judgment as to Defendants Martin, McDonald and Strack so that they may immediately appeal the Court's decision dismissing them from this case. *See id.* at 15-16. Plaintiffs argue that they have satisfied all of the elements for such relief, as set forth in Rule 54(b) of the Federal Rules of Civil Procedure. *See id.*

## III. DISCUSSION

**A.    Standard of review**

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g). *See Maye v. New York*, No. 1:10-cv-1260, 2011 WL 4566290, *2 n.6 (N.D.N.Y. Sept. 29, 2011). "'In order to prevail on a motion for reconsideration, the movant must satisfy stringent requirements.'" *Id.* (quoting *C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave. P'ship)*, 182 B.R. 1, 2 (N.D.N.Y. 1995)). A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "The prevailing rule 'recognizes only three possible grounds upon which motions for reconsideration may be granted;

they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice.'" *Maye*, 2011 WL 4566290, at *2 (quoting *In re C–TC 9th Ave. P'ship*, 182 B.R. at 3). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.

**B.      Defendants' motion for reconsideration**

> *1. Defendant Hogan*

Defendants argue that the Court improperly assumed that Defendant Nutting spoke with Defendant Hogan when he called Division Counsel's Office for advice regarding the search and seizure of Plaintiffs' property. *See* Dkt. No. 71-1 at 1. Further, Defendants claim that the Court assumed that Defendant Hogan directed Defendant Nutting to search and/or seize Plaintiffs' property. *See id.* at 1-2. They contend that neither of these assumptions is supported by admissible record evidence. *See id.* at 2. Specifically, Defendants contend that Defendant Nutting's sworn testimony establishes that he does not remember who he spoke to when he called Division Counsel's Office. *See id.* (citing Dkt. No. 66-1 at 70-71). They contend that initially Defendant Nutting speculated that he spoke with Ralph Ambrosio but that later, upon prompting, he speculated that it could have been Defendant Hogan. *See id.* (citing Dkt. No. 66-1 at 70-71). They claim that the only evidence Plaintiffs have submitted to rebut Defendant Nutting's sworn testimony is an unsworn letter, which they claim is inadmissible. *See id.*

In Defendants' original answer to the complaint, Defendant Nutting (who was the only named Defendant at that time) asserted that he seized the folder containing the suicide letters on the advice of "two government attorneys." *See* Dkt. No. 11 at ¶ 13. Plaintiffs then demanded the

identity of these attorneys. *See* Dkt. No. 67 at 20-21. In a March 11, 2011 letter, Assistant

Attorney General Michael McCartin provided the following response: "This supplements our

discovery response of this week. I have learned that the counsel from the NYSP that Inv. Nutting

spoke to on the day in question was Steve Hogan." *See id.* at 23.

Counsel for Defendants argue that this letter is inadmissible under Rule 801(d)(2)(D) of

the Federal Rules of Evidence because Defendant Hogan was not a defendant in this action until

May 6, 2011. *See* Dkt. No. 78 at 2. "Simply stated, there was no agency relationship between

Attorney Hogan and [the Attorney General's Office] at the time the letter was created." *See id.*

The Court disagrees.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial

or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

Under Rule 801(d)(2)(D) of the Federal Rules of Evidence, however, an out-of-court statement is

not hearsay if it is "a statement by the party's agent or servant concerning a matter within the

scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid.

801(d)(2)(D).

Although Defendants are correct that Defendant Hogan was not named as a Defendant

until after Plaintiffs received the letter at issue, the Court finds that the letter is nevertheless

admissible. In their original complaint, Plaintiffs included six John Doe Defendants, all of whom

were listed as employees of the New York State Police. *See* Dkt. No. 1 at ¶¶ 9-14. Although

Defendant Hogan had not yet been identified when the complaint was filed, Defendant Hogan's

interests were being represented by the Attorney General's Office from the outset of this

litigation. Section 63 of the New York Executive Law provides that the Attorney General is

charged with the responsibility to "prosecute and defend all actions and proceedings in which the

state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interests of the state[.]"  N.Y. Exec. Law § 63(1); *see also Cliff v. Vacco*, 267 A.D.2d 731, 732 (3d Dep't 1999) (finding that the Attorney General has a statutory obligation to represent State employees, employed by the Department of Correctional Services, in a civil proceeding commenced by the petitioner).  Mr. McCartin was required, through the discovery process, to disclose to Plaintiffs the identities of all parties involved with the incidents in dispute. Through that obligation and in response to Mr. Schockmel's discovery requests, Assistant Attorney General McCartin identified Defendant Hogan as the attorney with whom Defendant Nutting spoke on the day in question.  *See* Dkt. No. 67 at 20-23.  Since this statement clearly involved a matter within the scope of the agency and was made during the course of the agency, Defendants' arguments to the contrary are unavailing.

Alternatively, the Court finds that this letter is admissible pursuant to Rule 807 of the Federal Rules of Evidence.  According to Rule 807, "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice."  Fed. R. Evid. 807(a).  The letter is certainly offered as evidence of a material fact, *i.e.*, Defendant Hogan's personal involvement.  Further, the evidence is more probative on the point for which it is offered than any other evidence which Plaintiffs could procure through reasonable efforts.  Finally, the general purposes of the Rules of Evidence are best served by accepting the letter. *See Freedman*

*v. Value Health, Inc.*, 135 F. Supp. 2d 317, 332 & n.6 (D. Conn. 2001) (concluding that a letter from the defendants' attorney providing the defendants' loss projections with attached independent auditor's report and schedule was admissible for securities fraud summary judgment motion under Rule 807 because "there is no challenge to its authenticity, it is offered as evidence of a material fact [and] it is more probative on the point for which it is offered than any other evidence which the defendants can procure"), *aff'd*, 34 Fed. Appx. 408 (2d Cir. 2002).

Further, the Court finds unpersuasive Defendants' argument that the evidence does not support the fact that he approved the search and seizure. Defendant Nutting indicated that, after speaking with Plaintiff Donna Veeder's attorney, he called the Division Counsel's Office for the New York State Police, as well as the Albany County District Attorney's Office. *See* Dkt. No. 66-1 at 70-72. Although Defendant Nutting first stated that he believed that he spoke with Ralph Ambrosio from the Division Counsel's Office, he thereafter stated that it could have been Defendant Hogan with whom he spoke. *See id.* at 71-72. Defendant Nutting stated that he knew that they were "going to secure the evidence, but the letter to the attorney bothered [him]." *See id.* at 72. He then told the attorney with whom he spoke that he spoke with Plaintiffs' attorney and that he instructed Defendant Nutting that he could not seize the letter because it was privileged. *See id.* at 73. Defendant Nutting indicated that both attorneys with whom he spoke were hesitant to provide him with an answer. *See id.* ("You know, I remember I talked to Division Counsel and talked to the attorney – you know, everybody kind of seemed, aaa, aaa, I don't know"). Further, although Defendant Nutting informed the attorney from Division Counsel that there were also letters to the family, the attorney did not discuss that issue with him. *See id.* at 74. Moreover, the evidence does not establish, as Defendants suggest, that the decision to seize the letters came as a result of a conversation not Division Counsel's Office, but with the District

Attorney's Office.  Specifically, Defendant Nutting testified that "somewhere between the conversation with the Division Counsel and the District Attorney's Office, you know, the decision was made that we were going to take everything and seal it."  *See id.* at 74-75.

Finally, the Court rejects Defendants' arguments that, "even if there was admissible evidence to establish that Attorney Hogan provided advice to Sr. Inv. Nutting on the day in question, he would nonetheless be entitled to qualified immunity."  *See* Dkt. No. 71-1 at 2. Defendants contend that "[t]here is no evidence that Attorney Hogan was aware of any objection to a search or seizure of the letters, other than the privilege objection raised by [P]laintiffs' attorney."  *See id.*  Defendant Hogan, however, was aware that they did not consent to the seizure of the letters.  Regardless of the reason given for the lack of consent, viewing the disputed facts in the light most favorable to Plaintiffs, Defendant Hogan was made aware that an objection was made, yet still allegedly authorized the warrantless seizure of these documents.

Based on the foregoing, the Court denies Defendants' motion for reconsideration as to Defendant Hogan.

### *2. Defendant Port*

Defendants argue that the Court erred in denying their motion for summary judgment as to Defendant Port regarding the seizure of the letters and by denying him qualified immunity on the issue of the search.  *See* Dkt. No. 71-1 at 3.  Specifically, Defendants claim that Plaintiffs' arguments regarding the seizure of the letters are not supported by record evidence and that the decision to secure the letters was made at the direction of the District Attorney's Office.  *See id.* (citing Dkt. No. 66-5, pp. 44-45, 58).  Further, Defendants contend that, "[s]imilar to Investigators Strack and McDonald, there is no evidence that [P]laintiffs objected to Captain Port concerning a

search or seizure." *See id.* As such, Defendants contend that Defendant Port is entitled to qualified immunity on these claims.

During Defendant Port's deposition, he testified that he had a discussion about the folder containing the suicide letters with Defendant Nutting when he arrived at Plaintiffs' residence. *See* Dkt. No. 66-1 at 46-47. Defendant Port testified that Defendant Nutting informed him that "there was an attorney involved who indicated that this material was privileged material." *See id.* at 47. Defendant Port then discussed the issue with Defendant Nutting and they discussed "getting a legal opinion on whether we should take this material or not." *See id.* at 48. Defendant Port recalled that an attorney from the District Attorney's Office "indicated that we should not read the material, that we should seal the entire notebook, as I think it was being referred to at that point in time . . . And that the attorneys would work out the legal issues the following week." *See id.* at 49.

Contrary to Defendants' assertions, as set forth above, issues of fact preclude the Court from granting Defendants' motion on this ground. The undisputed facts do not establish, as Defendants contend, that "Captain Port stayed on the street, away from the house, until the scene was fully processed." Further, Defendant Port's deposition testimony makes clear that he knew that Plaintiff Donna Veeder did not consent to the seizure of the envelopes. He testified that Defendant Nutting informed him that Plaintiff's attorney spoke with him and objected to the seizure. *See* Dkt. No. 66-1 at 47.

Based on the foregoing, the Court denies Defendants' motion for reconsideration on this ground.

### 3. Illegal seizure under the Fourth Amendment

Defendants contend that, because they were validly in Plaintiffs' residence, and because the nature of the suicide notes was readily available, they were entitled to seize the suicide notes under the "plain view doctrine." *See* Dkt. No. 62-23 at 16-19. Plaintiffs, however, contend that Defendants were not validly in their residence and, regardless of whether they were permitted to be in their residence, the plain view doctrine is inapplicable to the present matter because this was not a criminal investigation. *See* Dkt. No. 67-2 at 10-12.

A plain view seizure is authorized if the police are lawfully in a position to view an object, if the object's incriminating character is readily apparent, and if they have a lawful right of access to the object. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citations omitted). The police must have probable cause to believe that the object in plain view is contraband or constitutes incriminating evidence in order to seize it. *See Arizona v. Hicks*, 480 U.S. 321, 326 (1987).

First, contrary to Plaintiffs' contention, the plain view doctrine has been held to be applicable to investigations into an alleged suicide, even when no criminal activity is suspected. *See Earle v. City of Vail*, 146 Fed. Appx. 990, 994 (10th Cir. 2005) (finding that the plaintiffs' Fourth Amendment rights were not violated because the plain view doctrine permitted the police officers to seize the suicide letters and noting that, "[w]hile the notes were not necessarily incriminating, they were, on their face, directly relevant to the police officers' investigation of Michael Earle's death"). Unlike the situation in *Earle*, however, issues of fact remain as to whether and when Plaintiff Donna Veeder withdrew or otherwise limited her written consent permitting Defendants "to search the entire premises, including the contents of any containers or boxes found thereon." *See* Dkt. No. 62-8 at 8. If Plaintiff Donna Veeder withdrew or otherwise

limited her consent, then, depending on when this occurred, Defendants may not have been lawfully in a position to view the object. Moreover, although the letters were addressed to Garry Veeder's family, it is not clear that the object's nature was readily apparent to Defendants.

In *Michigan v. Tyler*, 436 U.S. 499 (1978), the petitioner argued "that an entry to investigate the cause of a recent fire is outside [the Fourth Amendment's] protection because no individual privacy interests are threatened. If the occupant of the premises set the blaze, then . . . his 'actions show that he has no expectation of privacy' because 'he has abandoned those premises within the meaning of the Fourth Amendment.' And if the fire had other causes, 'the occupants of the premises are treated as victims by police and fire officials.'" *Michigan*, 436 U.S. at 505. Rejecting the petitioner's arguments, the Court held as follows:

> there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately. Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment. And under that Amendment, "one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." . . . The showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search, but the necessity for the warrant persists.

*Id.* at 506 (internal citation and footnote omitted).

As *Michigan* makes clear, the validity and scope of Plaintiff Donna Veeder's consent (and any subsequent withdrawal of the consent) must be determined before a decision can be reached on this issue. As discussed, since questions of fact exist on these issues, summary judgment is inappropriate.

24

Based on the foregoing, the Court denies Defendants' motion for reconsideration on this ground.

### 4. Defendants Hogan and Port opening the suicide letters

Defendants argue that the Court erred in denying Defendants Hogan and Port qualified immunity because "they could not have reasonably believed that their actions were unlawful under the Fourth Amendment." *See* Dkt. No. 71-1 at 3. Specifically, Defendants contend that no admissible evidence supports the Court's finding that it was "unclear whether they knew that [P]laintiff Donna Veeder revoked her written consent." *Id.* They claim that there is no admissible evidence to demonstrate that either Defendant Hogan or Defendant Port was aware that Plaintiff Donna Veeder "objected on any ground other than privilege." *Id.*

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit"). "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that the "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider

in either order.  *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted).

The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a

violation of a constitutional right."  *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citations

omitted).  The second is a determination of "whether the right at issue was 'clearly established' at

the time of defendant's alleged misconduct."  *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear

that a reasonable official would understand that what he is doing violates that right."  *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987).  "To determine whether a right is clearly established, we

look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court

or court of appeals case law supports the existence of the right in question; and (3) whether under

preexisting law a reasonable defendant would have understood that his or her acts were

unlawful."  *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Schecter v. Comptroller of

City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)).  "As the qualified immunity defense has evolved, it

provides ample protection to all but the plainly incompetent or those who knowingly violate the

law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

If there is no dispute as to any material fact, the issue of whether the official's conduct was

objectively reasonable is an issue of law to be decided by the court.  *See id.* at 368 (citation

omitted).  Any unresolved factual issues, however, must be resolved by the jury.  *See id.* (quoting

*Kerman*, 374 F.3d at 109) (other citations omitted).  Once the court has received the jury's

decision as to "what the facts were that the officer faced or perceived," the court must then "make

the ultimate legal determination of whether qualified immunity attaches on those facts."

*Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*,

66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, as discussed in the Court's March 29, 2013 Memorandum-Decision and Order, the Court agrees with Plaintiffs that Defendants' motion on this ground should be denied.  In *United States v. Jacobsen*, the Supreme Court held that,

> [w]hen the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an "effect" within the meaning of the Fourth Amendment.  Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable.  Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.

*United States v. Jacobsen*, 466 U.S. 109, 114 (1984) (internal footnotes and citations omitted).

In the present matter, the law was clear at the time that warrantless searches of "[l]etters and other sealed packages" are presumptively unreasonable.  *See id.*  Even assuming that Defendants lawfully seized this evidence in an effort to preserve it for purposes of their investigation into the death of Garry Veeder, Defendants Hogan and Port's actions cannot be said to be objectively reasonable in light of the facts in dispute.  For example, it is unclear whether Defendant Hogan actually spoke with Defendants during the search and, if he did, what the content of that conversation was.  Defendant Hogan stated in his declaration, however, that it would not be his practice to advise any member of the State Police to search or seize evidence without a warrant, consent, or another exception to the warrant requirement.  *See* Dkt. No. 62-1 at ¶ 39 (citation omitted).  Further, it is unclear whether Defendants Hogan and Port knew the extent and time of Plaintiff Donna Veeder's alleged withdrawal of her written consent.  Finally, regardless of the stated reason that Plaintiff Donna Veeder or her attorney did not consent to the seizure of the letters and their subsequent search, the questions of fact present preclude the Court from finding as a matter of law that a reasonable officer would have believed that his actions were

lawful.

Based on the foregoing, the Court denies Defendants' motion for reconsideration as to this claim.

**C.**     **Plaintiffs' motion for reconsideration or, in the alternative, for entry of judgment**

*1. Seizure of the letters*

Plaintiffs correctly assert that, in Defendants' statement of material facts, they admit to the following allegations:

> 3. Garry Veeder left a folder containing letters addressed to each plaintiff, as well as to plaintiffs' attorney, Steven Kouray.
>
> 4. On or about May 23, 2008 defendant Steven Nutting advised plaintiff Donna Veeder that he intended to take the folder with letters left by Garry Veeder.
>
> 5. Donna Veeder advised defendant Nutting that she objected to his taking the folder.

Dkt. No. 72-2 at 2-3 (citing Dkt. No. 61-2). Despite these admissions, the evidence in the record, including Plaintiff Donna Veeder's testimony, is less than clear and creates factual disputes that must be decided by the jury. "Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions." *Walker v. Artus*, ___ F. Supp. 2d ___, 2014 WL 675815, *5 (N.D.N.Y. Feb. 21, 2014 (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts")).

Moreover, although Defendants do not contend that this was a criminal investigation, Plaintiffs are mistaken in their argument that the plain view doctrine is inapplicable. "An officer may enter the home if 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *United States v. Taylor*, 624 F.3d 626, 631 (4th Cir. 2010) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). Further, officers "[m]ay seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 437 U.S. at 393. In the case of firefighters responding to a reported fire, for example, "[i]f the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." *Michigan v. Tyler*, 436 U.S. 499, 510 (1978).

In *Baker v. United States*, No. 3:10-CV-762, 2011 WL 3841690 (E.D. Va. Aug. 30, 2011), an EMT responded to the petitioner's home because of a reported suicide attempt and, while there, saw a note on the top of a refrigerator, which was semi-hidden by a cabinet above the refrigerator that left no more than four inches of space between the top of the refrigerator and the bottom of the cabinet. *See id.* at *8. The petitioner argued that the letter, which was a suicide letter admitting to criminal activity, was not in plain view and was not the reason for which the EMT was on the premises; and, therefore, the seizure of the note violated his Fourth Amendment rights. *See id.* Denying the petitioner's claim that his counsel was ineffective for failing to raise this argument, the court held as follows:

> Police officers, firefighters, and EMTs responded to a call regarding an attempted suicide attempt at Petitioner's home. Petitioner admits Logan found the note while looking around the home for something that might indicate Petitioner had taken drugs or other chemicals. Logan found a note in plain view on top of the refrigerator. Logan's initial entry was undoubtedly justified, as he was responding to a

> call regarding an attempted suicide. His looking around the premises to locate anything related to the suicide attempt was therefore also constitutional. It follows that Logan's seizing the handwritten note was not outside the exigencies that justified his initial entry, and Petitioner's Fourth Amendment claim would have failed if it had been raised.

*Id.* at *9;[7] *see also Earle v. City of Vail*, 146 Fed. Appx. 990, 992-94 (10th Cir. 2005).

The Court also finds unpersuasive Plaintiffs' argument that *Earle v. City of Vail*, is inapplicable. Plaintiffs argue that "*Earle* justified the seizure of suicide letters because 'they were, on their face, directly relevant to the police officers' investigation." Dkt. No. 72-2 at 3-4. Although it is true that the letters in this matter had not yet been removed from their envelopes when they were seized, the affidavits and deposition testimony make clear that the officers reasonably believed that they were suicide notes, a belief that was possibly shared by Plaintiff Donna Veeder. As such, the Court rejects this argument.

Finally, even if Plaintiff Donna Veeder did object to Defendants' seizure of the folder containing the letters, viewing the evidence in the light most favorable to Defendants as the non-moving parties, the letters were in the officers' plain view while they were in Plaintiffs' residence by her consent and they were relevant to their investigation of Mr. Veeder's death. As such, the fact that Plaintiff Donna Veeder did not consent to the seizure of the letters is not dispositive of this issue.

Based on the above authority, the Court finds that it properly denied Plaintiffs' motion for summary judgment in light of the issues of fact discussed in its March 29, 2013 Memorandum-

---

[7] Although the Court finds the discussion in *Baker* instructive, the Court also recognizes that the situation in *Baker* arose in the context of a habeas corpus petition, not in a civil rights action pursuant to 42 U.S.C. § 1983. Moreover, the petitioner in *Baker* was arguing that his attorney was ineffective for failing to move to suppress the letter in both a motion to suppress before trial and then to raise the argument on appeal. *See Baker*, 2011 WL 3841690, at *8-*9.

Decision and Order. Accordingly, the Court denies Plaintiffs' motion for reconsideration as to this claim.

### *2. Opening of the letters*

Plaintiffs next argue that Defendants excuse for opening the envelopes, *i.e.*, "that the envelopes *may have contained* material relevant to a non-criminal investigation[,]" is "simply insufficient" to withstand their motion for summary judgment. *See* Dkt. No. 72-2 at 7 (emphasis in original). Plaintiffs contend that, since the record makes clear that Plaintiff Donna Veeder never consented to the seizure of the letter, the opening and copying of Plaintiffs' letters was "'presumptively unreasonable,' and [D]efendants Port and Hogan have provided no legally sufficient excuse." *Id.* at 8.

As discussed above, however, viewing the facts in favor of the nonmoving parties, a jury could find that Defendants were justified in seizing the folder containing the letters, as it was readily apparent that they were relevant to the ongoing investigation into Mr. Veeder's death. As such, Plaintiff Donna Veeder's lack of consent to their seizure is not dispositive of this issue.

Based on the foregoing, the Court denies Plaintiffs' motion for reconsideration as to this claim.

### *3. The seizure of Plaintiff Donna Veeder's briefcase*

Plaintiffs next contend that neither Defendant McDonald nor Defendant Strack could have reasonably believed that they had consent to seize Plaintiff Donna Veeder's briefcase. *See* Dkt. No. 72-2 at 9. Plaintiffs claim that Defendants McDonald and Strack "both state that they 'reasonably believed that our *search* was pursuant to a validly executed consent.'" *Id.* (emphasis

in original). Although Plaintiffs accept this assertion as true for purposes of their motion, they contend that "[n]either defendant asserts, however, that they reasonably believed they had consent to *seize* any material." *Id.* Plaintiffs assert that, although the consent "arguably placed McDonald and Strack lawfully in a position to view the briefcase and granted them right of access[,]" it does **not** authorize the seizure of any objects, barring some other justifying circumstance, a readily apparent incriminating character of the briefcase or the papers inside was required for them to seize it." *Id.* (emphasis in original).

Again, the Court finds Plaintiffs arguments unpersuasive. Defendants Strack and McDonald deny that they knew that Plaintiff Donna Veeder withdrew her consent or otherwise objected to the search of her residence and nothing in the record suggests otherwise. Further, the record makes clear that Defendants Strack and McDonald knew that the suicide letters had been seized prior to their arrival and, again, nothing in the record suggests that Defendants Strack and McDonald were aware that Plaintiff Donna Veeder objected to the seizure. *See* Dkt. No. 69 at 32. As such, the Court correctly determined that an objectively reasonable officer in the position of Defendants Strack and McDonald would believe that they could seize evidence that they believed to be relevant to their investigation. Finally, as discussed, the fact that neither Defendant believed that the briefcase or its contents "suggested criminal activity" does not mean that Defendants did not reasonably believe that the items were relevant to their investigation into Garry Veeder's death.

Based on the foregoing, the Court finds that it correctly granted Defendants Strack and McDonald summary judgment on qualified immunity grounds.

### *4. Interrogation of Plaintiff Stacy Veeder*

Plaintiffs argue that the Court erred in granting summary judgment on qualified immunity grounds to Defendant Martin regarding his interview of Plaintiff Stacy Veeder. *See* Dkt. No. 72-2 at 13. Plaintiffs argue that the Court failed to view the encounter from Plaintiff Stacy Veeder's point of view, which, Plaintiffs claim, "began with more than a half dozen unidentified members of the New York State Police walking, uninvited throughout her house, room to room." *Id.* at 14. Then, two members of the New York State Police, who she blamed for her father's death, "'told [her] to sit down, and then sat on either side of [her] on a couch.' They informed her she 'had to give a statement.'" *Id.* (quotation omitted). Then, one of the officers, Defendant Martin, told her "'we are going outside.' . . . Martin took Stacy down the street to his car (which was not, as asserted by defendants, 'in front of the residence')." *Id.* (quotation omitted). Plaintiffs contend that "[t]his is the context in which Martin's actions within the car must be examined." *Id.*

Even when the Court views Defendant Martin's actions in this context, the Court finds that it properly determined that Defendant Martin is entitled to qualified immunity as to this claim.

As the Court discussed in its March 29, 2013 Memorandum-Decision and Order, during her deposition, Plaintiff Stacy Veeder indicated that she was in the car for approximately thirty (30) minutes and that she never asked Defendant Martin if she could exit the vehicle. *See* Dkt. No. 62-22 at 7. Although she indicated that she did not ask to exit the vehicle at any point during the interview, Plaintiff Stacy Veeder qualified her response as follows:

> A.     At one point, my mother's friend, Juliann, came over to the car, and in order to speak with her since the windows were up, I opened – I attempted to open the door and the plain-clothed man – I couldn't get anything out to her. I couldn't talk to her because the plain-clothed man was talking over me and saying something to the effect of she has to give a statement, she is almost done, which, to me, I was very afraid and that, to me, meant along with the fact that I was told I had to make a statement, that I was in that car to make a statement and that I felt that I was not going to be able to leave that car until something adequate to whatever he wanted was, you know, achieved.

Q.    So you said you tried to open the car door?

A.    I did open the car door.

Q.    Okay.  And is that when – well, then, what did the investigator say, do you remember?

A.    He reached across me, because it was the passenger's door, trying to grab the – you know, like in a motion to grab the bar or handle that you would open the door with, and then was speaking across me to Juliann, my mother's friend, who was outside, she had a cup of water or something, telling her she has to give a statement, you know, she will be done like soon.

Q.    Okay.  Now, when you say he reached across you, what do you mean by that?

A.    I mean, if he is sitting here and I'm sitting here, his hand coming over as I'm opening the door to try to indicate to me, you know, that I'm not leaving the car, because the door – I was in the process of opening the door and I immediately felt that I was not – that it was not an option for me to be leaving the car.

* * * * *

Q.    Did he tell you that, that you couldn't leave the car without signing [the written statement]?

A.    No.

Q.    And at no point in that car did you ask to leave the car, did you?

A.    No.

Q.    And did you – other than when Juliann came to the car and said you would be done shortly, did you make any attempt to exit the car?

A.    I remember having my hand on the handle because I thought I was going to throw up, and then I later did throw up multiple times, I didn't open the door, but I remember holding it there.

Q.    Were you prevented from doing that?

A.    No.

*See id.* at 7-8, 10-11.  After Plaintiff Stacy Veeder signed the written statement prepared by

34

Defendant Martin, she testified that she walked back to the house and proceeded to go upstairs. *See id.* at 11.

According to Defendant Martin's affidavit, after being directed to take Plaintiff Stacy Veeder's statement, he approached her and advised her of his intention. *See* Dkt. No. 62-2 at ¶ 5. Further, he states that Plaintiff Stacy Veeder "was visibly and understandably upset, but she was cooperative. Because there were so many distractions in the house, I suggested that I take her statement in my car, which was parked in front of the residence. Ms. Veeder agreed." *See id.* at ¶ 6.

In light of Plaintiff Stacy Veeder's testimony and Defendant Martin's uncontested statements, the Court finds that a reasonable officer in Defendant Martin's position would not believe that his actions violated Plaintiff Stacy Veeder's rights. As the testimony makes clear, Defendant Martin acted reasonably throughout the entire interview. Plaintiffs do not contend that Defendant Martin conducted the interview in his vehicle for any reason other than because there were so many distractions in the house. Moreover, Plaintiff Stacy Veeder willingly accompanied him to his vehicle when asked and never requested that she be permitted to leave or that the interview take place at some other time. Further, Plaintiff Stacy Veeder testified that she was allowed to keep her hand on the door handle, an indication that she could have exited the vehicle at any time. Any reasonable officer would believe that any uneasiness or anxiety on Plaintiff Stacy Veeder's part was not due to the officer's actions in conducting the interview, but because of the traumatic events she witnessed that morning.

Based on the foregoing, the Court finds that a reasonable officer in Defendant Martin's position would not believe that his actions violated Plaintiff Stacy Veeder's right; and, therefore, the Court properly granted Defendants' motion for summary judgment as to Defendant Martin on

qualified immunity grounds.


### 5. Plaintiffs' motion for entry of judgment

Plaintiffs argue that the Court should direct entry of judgment as to Defendants Martin, McDonald and Strack because they are the only individuals sued for the seizures of Plaintiff Stacy Veeder's person and Plaintiff Donna Veeder's briefcase. *See* Dkt. No. 72-2 at 15-16. Plaintiffs claim that the Court's decision regarding these individuals and claims is "in conflict with the holdings of most of the other Courts examining warrantless seizure questions and, it is submitted, would benefit from guidance from the Second Circuit." *Id.* at 16. Finally, Plaintiffs contend that "entry of final judgment would avoid the possibility of expensive and duplicative trials, as the claims against the dismissed defendants would survive the trial against the remaining defendants." *Id.*

"[I]n the federal district courts, the entry of a final judgment is generally appropriate 'only after all claims have been adjudicated.'" *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d Cir. 2011) (quoting *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991)). Rule 54(b) of the Federal Rules of Civil Procedure provides "an exception to this general principle," *id.*, permitting a district court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties," but "only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). However, the Second Circuit has counseled that the historic "policy against piecemeal appeals 'requires that the court's power to enter such a final judgment before the entire case is concluded . . . be exercised sparingly.'" *Novick*, 642 F.3d at 310 (quoting *Harriscom Svenska AB*, 947 F.2d at 629).

"[C]ertification under Rule 54(b) should be granted only if there are interests of sound

judicial administration and efficiency to be served or, in the infrequent harsh case where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1025 (2d Cir. 1992) (citations, alterations, and internal quotation marks omitted). This language indicates that certification under Rule 54(b) is appropriate (1) to serve judicial administration and efficiency or (2) where there is some danger of unusual hardship or injustice through delay.

In this regard, "[t]o be appropriate, a Rule 54(b) certification must take account of both the policy against piecemeal appeals *and* the equities between or among the parties." *Novick*, 642 F.3d at 310 (emphasis added); *see also Nippon Yusen Kaisha v. FIL Lines USA Inc.*, No. 12 CIV. 6643 GWG, 2013 WL 5663080, *6 (S.D.N.Y. Oct. 18, 2013) (citing *Novick*, 642 F.3d at 310). In other words, to prevail on a Rule 54(b) certification motion, the moving party must satisfy one of these two prongs. *See In re Vivendi Universal, S.A .,Sec. Litig.*, No. 02 CIV. 5571(RJH), 2012 WL 362028, *4 (S.D.N.Y. Feb. 6, 2012) (holding that "even though the Court has determined that judicial efficiency will not be served by certifying a partial appeal here, the plaintiffs could still prevail on the motion if they are able to demonstrate prejudice . . . of such a character as to 'offset' the Court's efficiency conclusion"), *reconsideration denied*, 861 F. Supp. 2d 262 (S.D.N.Y. 2012).

In the present matter, the Court finds that entry of judgment pursuant to Rule 54(b) is inappropriate. First, the Court disagrees with "the order involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Dkt. No. 80 at 4. Although the case involves a somewhat unique set of facts, as discussed above, other courts throughout the country have dealt with factually similar situations. Second, relevant to the

Court's inquiry here, the Second Circuit in *Cullen v. Margiotta*, 618 F.2d 226 (2d Cir. 1980), reversed a district court's Rule 54(b) certification, concluding that "'[j]udicial economy will best be served by delaying appeal until all issues can be confronted by th[e appellate] court in a unified package[.]'" *Id.* at 228. The court explained that such an outcome was "particularly" appropriate where "the adjudicated and pending claims are closely related and stem from essentially the same factual allegations." *Id.*

As such, the Court believes that it would not "advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with [the] . . . case in successive appeals from successive decisions on interrelated issues." *Novick*, 642 F.3d at 311 (internal quotation marks omitted). The Court, therefore, concludes that Plaintiffs have not satisfied this particular burden in moving under Rule 54(b).

Even though the Court has determined that judicial efficiency will not be served by certifying a partial appeal here, Plaintiffs could still prevail on their motion if they are able to demonstrate prejudice – "some danger of hardship or injustice," *Hogan v. Consol. Rail Corp.*, 961 F.2d 1021, 1025 (2d Cir. 1992 – of such a character as to "offset" the Court's efficiency conclusion. *See Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8 n.2 (1980). Alas, they have not. Such a danger may be presented where an expensive and duplicative trial could be avoided if, without delaying prosecution of the surviving claims, a dismissed claim were reversed in time to be tried with the other claims. *See, e.g., Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 70 (2d Cir. 1977). Nor does the instant motion concern a situation where discovery that would require the participation of a dismissed party (or involve a dismissed claim) is not yet complete. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, No. 92 Civ. 6879, 1998 WL 647167, *6

(S.D.N.Y. Sept. 22, 1998), *aff'd*,106 F.3d 11 (2d Cir. 1997).  Finally, a successful appeal by Plaintiffs here would not potentially "resolve the case in its entirety in [a] single appeal."  *Cuoco v. Moritsugu*, 222 F.3d 99, 110 (2d Cir. 2000) (citation omitted).  Therefore, the Court is satisfied that Plaintiffs will not suffer any unusual hardship as a result of the denial of this motion.

Based on the foregoing, Plaintiffs' motion for entry of judgment and certification pursuant to Rule 54(b) of the Federal Rules of Civil Procedure is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for reconsideration (Dkt. No. 71) is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' motion for reconsideration or, in the alternative, for the entry of judgment and certification pursuant to Rule 54(b) (Dkt. No. 72) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 26, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge